# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **EX PARTE PETITION OF THE REPUBLIC OF TURKEY FOR AN ORDER DIRECTING DISCOVERY FROM HAMIT CICEK, PURSUANT TO 28 U.S.C. § 1782.** | **Civil Action No. 2:19-cv-20107-ES-SCM** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE ORDER PURSUANT TO *F.R.C.P.* 60(b), OR TO QUASH SUBPOENAS PURSUANT TO *F.R.C.P.* 45(b)(3)

**WEINER LAW GROUP LLP**
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054-0438
Phone (973) 403-1100
rberutti@weiner.law
Attorneys for Interested Party, Hamit Cicek

Of Counsel and on the Brief:

Ronald A. Berutti, Esq.
Gwyneth Murray-Nolan. Esq.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**Contents**

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 5

    A.   The Treaty of Extradition and Mutual Assistance in Criminal Matters. ......................... 5

    B.   The Republic of Turkey failed to Disclose to the Court that Mr. Cicek is Wanted in Turkey for Alleged Political 'Crimes'. ........................................ 6

    C.   The Persecution of Members of the Gulen Movement by the Republic of Turkey. .................................................................................................. 7

LEGAL ARGUMENT ................................................................................................ 19

POINT I ..................................................................................................................... 19

THE ORDER GRANTING THE REPUBLIC OF TURKEY THE RIGHT TO SERVE SUBPOENAS SHOULD BE VACATED, PURSUANT TO *FED . R. CIV. P*. 60(B), DUE TO ITS FRAUDS, MISREPRESENTATION, AND MISCONDUCT, AND THAT OF ITS ATTORNEYS, AND THE LACK OF DUE PROCESS AFFORDED MR. CICEK. ................ 19

POINT II .................................................................................................................... 29

THE SUBPOENAS SHOULD BE QUASHED. ........................................................... 29

# **TABLE OF AUTHORITIES**

**Cases**

*Armstrong v. Manzo*,
  380 U.S. 545, 552. .................................................................................. 27, 29

*Baldwin v. Hale*,
  1 Wall. 223 ................................................................................................. 27

*Brown v. Pennsylvania Railroad Company*,
  F.2d 522, 527 (3d Cir. 1960) ..................................................................... 20

Cf. *DKT Memorial Fund Ltd. v. Agency for International
  Development*,
  887 F.2d 275, 307–308 (C.A.D.C.1989) .................................................... 23

*Fears v. Wilhelmina Model Agency, Inc.*,
  Case No. 02–cv–4911, 2004 WL 719185, at *1 (S.D.N.Y. Apr.
  1, 2004) ....................................................................................................... 30

*Floorgraphics Inc. v. News Am. Mktg. In-Store Servs., Inc.*,
  434 Fed. Appx. 109, 111 (3d Cir. 2011) .................................................... 20

*Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ..................................................... 27

Grannis v. Oredean,
  234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363 ............................................... 27

*Hovey v. Elliott*,
  167 U.S. 409 ............................................................................................... 27

*In re Lazaridis*,
  865 F. Supp. 2d 521, 526 (D.N.J. 2011) .................................................... 25

*Info-Hold, Inc. v. Sound Merch., Inc.*,
  538 F.3d 448, 455 (6th Cir. 2008). ............................................................ 20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241(2004).............................................................................. 24, 25

*Jordan*,
  1996 WL 528950 ............................................................................................ 19

*Mannington Mills, Inc. v. Armstrong World Indus., Inc.*,
  206 F.R.D. 525, 529 (D.Del.2002) ........................................................... 29,30

*Minneapolis, St. Paul & S.S. Marie Ry. Co. v. Moquin*,
  283 U.S. 520, 521-522 (1931) ...................................................................... 20

*Murphy v. Waterfront Comm'n of N.Y. Harbor*,
  378 U.S. 52 (1964) ........................................................................................ 23

*Seaboldt v. Pennsylvania R. Co.*,
  290 F.2d 296, 300 (3d Cir. 1961) ................................................................. 20

*State v. Camacho*,
  218 N.J. 533, 543 (2014) .............................................................................. 22

*State v. P.Z.*,
  152 N.J. 86, 101 (1997) ................................................................................ 22

*State v. Reed*,
  133 N.J. 237, 250 (1993) .............................................................................. 22

*State v. Strong*,
  110 N.J. 583, 595 (1988) .............................................................................. 22

*U.S. v. Balsys*,
  524 U.S. 666 (1998) ................................................................................. 22, 23

*United States v. Sealed 1, Letter of Request for Legal Assistance
  from the Deputy Prosecutor Gen. of the Russian Fed'n*,
  235 F.3d 1200, 1206 (9th Cir. 2000) ........................................................... 28

*United States v. Tiede*,
  86 F.R.D. 227 (U.S.Ct.Berlin 1979) ............................................................ 23

*United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271
  (2010)............................................................................................................. 27

*Windsor v. McVeigh*,
  93 U.S. 274 .................................................................................................... 27

**Statutes**

28 U.S.C. § 1782 ............................................................................................................... 1, 25

*N.J.S.A.* 2A:84A–19 ......................................................................................................... 22, 24

**Other Authorities**

Biunno, Weissbard & Zegas,
    *Current N.J. Rules of Evidence (GANN),* Comment 1 to Rule
    503 .......................................................................................................................... 22

E. Griswold, *The Fifth Amendment Today* 7 (1955) ...................................................... 23

*Freedom in the World 2019* ............................................................................................ 16

*New York Times* .............................................................................................................. 15

*Rule of Law Index 2019* .................................................................................................. 16

S.Rep. No. 88–1580,
    88th Cong., 2d Sess. (1963), reprinted in 1964 U.S.C.C.A.N.
    3782, 3788. ............................................................................................................. 28

*Turkey 2018 Human Rights Report* .................................................................................. 7

**Rules**

Fed.R.Civ.P. 11(b) ........................................................................................................... 25

Fed.R.Civ.P. 45 ..................................................................................................... 1, 29, 31

Fed.R.Civ.P. 60 ............................................................... 1, 19, 20, 26, 27, 28, 29, 31

*N.J.R.E.* 503 ................................................................................................................ 22, 24

N.J.R.P.C. 3.1 ................................................................................................................... 25

N.J.R.P.C. 3.4 ................................................................................................................... 25

**Treatises**

Extradition and Mutual Assistance in Criminal Matters,

32 U.S.T. 3111 ............................................................................................................. 5

**Constitutional Provisions**

U.S. Constitution........................................................................................................... 22

## PRELIMINARY STATEMENT

Hamet Cicek ("Mr. Cicek") moves this Court, pursuant to *Fed. R. Civ. P.* 60(b), for an Order vacating an *Ex Parte* Order which granted the Republic of Turkey the right to subpoena him for documents and testimony, pursuant to 28 U.S.C. § 1782 (the "Statute") (Declaration of Ronald A. Berutti ["Berutti Dec."], Ex. P). Alternatively, Mr. Cicek seeks entry of an Order quashing the subpoenas, pursuant to *Fed. R. Civ. P.* 45(d)(3) (Berutti Dec., Exs. A and B). The *Ex Parte* Order was obtained by the Republic of Turkey based on its own fraud, misrepresentations and misconduct and, probably, that of its attorneys. More specifically, the Republic of Turkey and its attorneys failed to disclose to this Court that in 2016, Mr. Cicek was formally charged by the Republic of Turkey with an alleged crime for which he is being prosecuted. The charges against Mr. Cicek are politically motivated allegations that he is a terrorist.  They are part of an internationally-condemned worldwide persecution by the Republic of Turkey--which includes widescale abuses of basic human rights--of the hundreds of thousands of Turkish citizens which it is similarly targeting. Further, the Order was entered without notice to Mr. Cicek or opportunity to be heard in objection, in violation of his due process rights, thus causing him grievous prejudice.

In obtaining the *Ex Parte* Order without disclosing the evidence of the criminal proceedings against Mr. Cicek, the Republic of Turkey and its attorneys have surreptitiously recruited this Court to participate in a world-wide persecution of innocents being carried out by the Republic of Turkey.[1]  The civilized world has roundly condemned the Republic of Turkey's

---

[1] King & Spalding LLP represents the Republic of Turkey in the underlying arbitration which led to its filing the Petition. In support of their Petition, they expansively briefed the allegations that Mr. Cicek is associated with a terrorist organization. See, e.g., Declaration of Viren Mascarenhas ¶¶5, 6, 9 (detailing Attorney Mascarenhas' purported knowledge of the terrorist investigation into Mr. Cicek's media company by the Republic of Turkey); Brief in Support pp. 1-6

actions in such regard. Certified translations of a Warrant of Seizure and a Search Warrant against Mr. Cicek, among other relevant criminal process, have recently been received by his attorneys. (Berutti Dec., Exs. D-G). The Republic of Turkey is using the Statute and our courts as a method of illicitly gathering information to aid and assist in its prosecution of active criminal proceedings against Mr. Cicek, which have been ongoing since July 2016. In so doing, the Republic of Turkey is attempting to circumvent the *Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of American and the Republic of Turkey* (the "Treaty").  It plainly is doing so because it recognizes that the United States will not aid the Republic of Turkey in its efforts to persecute Mr. Cicek. Similarly, the Republic of Turkey is seeking to violate Mr. Cicek's rights under the Turkish Constitution and, it is submitted, New Jersey's statutes and laws with respect to Mr. Cicek's right not to give evidence against himself.

The politically motivated and false charges against Mr. Cicek are part of the Republic of Turkey's relentless efforts to repress purported political opponents of Turkish President Recep Tayyip Erdogan and his regime, purportedly arising out of an alleged failed coup attempt in July 2016. Specifically, the Republic of Turkey's illegitimate efforts are aimed at perceived supporters of a peaceful philosophy, which alternatively has been called "Gulen Movement"

---

(including, without limitation, that Mr. Cicek was a direct participant in an alleged scheme in which he transferred shares of his media corporation, which was being investigated  for links to "a known terrorist organization … FETO" (id at 3). Since the Republic of Turkey is claiming in the arbitration, per its Petition, that the transfer of shares was a sham designed illegitimately to seek treaty protection in order to frustrate the Republic of Turkey's investigatory efforts, it is inconceivable that the criminal charges against Mr. Cicek are not part of the arbitration record. It is highly doubtful that King & Spalding was unaware of the criminal charges levied against Mr. Cicek by their client. At minimum, they were on inquiry notice and failed to so inform the Court when they filed the Petition. Thus, all references to the attorneys' knowledge herein are based on

worldwide, and "FETO/PDY" by the Erdogan regime. Had Mr. Cicek been given notice of the *Ex Parte* Petition and an opportunity to be heard, he would have amply demonstrated that the Republic of Turkey is not legally entitled to any such relief, and that the Court should not have exercised its broad discretion to enter an Order under the Statute, even if the Republic of Turkey had been on firm legal footing in seeking the Order, which it was not.

The "Gulen Movement" is an inclusive and moderate Islamic philosophy with no known structure. "Gulen Movement" actually describes followers of a moderate Islamic cleric, Fethullah Gulen, ***who has peacefully lived in exile in the United States since 1999***. Indeed, Mr. Gulen has denied any responsibility for, and otherwise has condemned, the purported coup attempt. Mr. Gulen's teachings inspire people to support numerous admirable causes, such as education, peace and dialogue among religions, advancement and strengthening of civil society, democratic participation, and the rule of law. The United States, the United Kingdom, the European Union, and the United Nations, do not consider the Gulen Movement to be a terrorist organization. Its supporters are only so seen by the Republic of Turkey, whose broadly-condemned crackdown has been felt by tens of thousands of civil servants and private citizens of Turkey, including widescale termination of judges, lawyers, police, and educators who are suspected of supporting the movement. Tens of thousands of arrests; reported torture of those believed to be associated with the Gulen Movement; reported international kidnappings of Gulen Movement supporters--who then are brought back to the Republic of Turkey and believed to be imprisoned and tortured--and a wholesale crackdown on a free press, are also widely reported.

---

information and belief that at all pertinent times, they knew that Mr. Cicek is being prosecuted for such alleged crimes in the Republic of Turkey.

The fact that the Republic of Turkey formally charged Mr. Cicek with such "crimes", dating back as far as July 2016, rendered the Republic of Turkey ineligible for relief under the Statute. Mr. Cicek's status as a wanted alleged criminal barred the Republic of Turkey from obtaining relief under the Statute. Yet such facts were not disclosed to this Court in the supporting Declaration of Viren Mascarhenas, Esq., or in the supporting Brief. Further, given the criminal charges, Mr. Cicek has an absolute right not to provide evidence which may incriminate him under the Turkish Constitution and, it is argued, the State of New Jersey's statutes and laws. Such privileges provide another bar to the Republic of Turkey's ability to obtain relief under the Statute. Yet again, the Republic of Turkey and its attorneys did not disclose same in its *Ex Parte* Petition. However, that the Republic of Turkey and its attorneys pursued and obtained such relief *Ex Parte*, demonstrates that that they abused process to prevent the innocent Mr. Cicek from having the opportunity to raise his valid legal opposition to the relief ultimately obtained against him without notice. This should come as no surprise, since the Republic of Turkey has eschewed due process around the world for those allegedly supporting the Gulen Movement, which President Erdogan has vowed to "destroy", according to one well-regarded legal expert, who is quoted herein.

Moreover, the Declaration of Viren Mascarhenas, Esq. of King & Spalding LLP, on which the *Ex Parte* Petition was exclusively based, for 'facts', is strictly his opinion and is not fact-based at all. When giving his opinions, Mr. Mascarhenas obviously never provided the fact that criminal charges existed against Mr. Cicek in the Republic of Turkey, or that Mr. Cicek had a right against self-incrimination.

Mr. Cicek thus hereby requests that the Order be vacated, and that the Petition should be dismissed with prejudice. Further, and in the alternative, Mr. Cicek requests that the subpoenas

served on him be quashed, since they additionally seek to compel him to provide privileged information to the Republic of Turkey, and otherwise are unduly burdensome.

In any event, this Court should not condone legal process which would expose an American resident to potential criminal process, which here is in issue. Mr. Cicek would not receive due process, would potentially be tortured, and would not be provided with competent legal counsel or an unbiased judiciary should he incriminate himself under the Republic of Turkey's outrageous and ongoing persecution, which violates all standards of human decency. The barbaric nature of the Republic of Turkey's crackdown against innocent civilians who wish only the peaceful right to speak freely, think freely, assemble, and to worship--the most basic of human rights which we have enshrined in our First Amendment--should not receive aid and comfort under the Statute or in our courts. Thus, the Motion should be granted.

## STATEMENT OF FACTS

**A.**     **The Treaty of Extradition and Mutual Assistance in Criminal Matters.**

On January 1, 1981, the Treaty between the United States and the Republic of Turkey, took effect.[2] (Berutti Dec., Ex. H). Chapter II thereof concerns the providing of "Mutual Assistance in Criminal Matters", including the way documents related to criminal prosecutions may be requested. Judicial assistance may be refused for certain reasons, including that the alleged offense is one "which the Requested Party considers to be a political offense, or an offense connected with a political offense." There is no other way for the Republic of Turkey legally to seek aid in its prosecution of those criminally charged under its laws who are in the United States.

---

[2] 32 U.S.T. 3111 (effective January 1, 1981).

**B.**     **The Republic of Turkey failed to Disclose to the Court that Mr. Cicek is Wanted in Turkey for Alleged Political 'Crimes'.**

The Statute may not be used to aid a foreign tribunal in a criminal matter once a person who is the subject of an application for discovery under the Statute has been formally accused of a crime. In bringing its *Ex Parte* Petition, the Republic of Turkey and its attorneys knowingly failed to disclose the material facts to this Court that Mr. Cicek has been formally accused of being a "criminal" and "terrorist" by the Republic of Turkey, dating back to July 2016. Pursuant to the Orders issued against Mr. Cicek, he is subject to arrest, interrogation, seizure of assets and other such 'remedies'. (Berutti Dec., Exs. D-G). However, like hundreds of thousands--or even millions--of other Turkish citizens, Mr. Cicek is suspected of supporting the Gulen Movement. Consequently, his alleged crimes of terrorism are false, and merely are part of the Republic of Turkey's persecution of President Erdogan's perceived political enemies, all of which point to Mr. Cicek being accused of a political offense (or one connected with a political offense), leaving the Treaty to be the Republic of Turkey's only avenue for U.S. assistance with its information-gathering against Mr. Cicek. The Treaty grants Mr. Cicek protection from the Republic of Turkey's extra-territorial efforts to persecute those believed to be associated with the Gulen Movement, and especially should protect against misuse of the Statute as an end-run around proper legal process.

Perhaps most troublesome is that the Republic of Turkey's attorneys, King & Spalding, almost certainly knew of the criminal actions being brought against Mr. Cicek. Based on the Declaration and Brief supporting the *Ex Parte* Petition, such criminal actions are believed to be a matter of record in the pending arbitration which led to entry of the *Ex Parte* Order, leading to issuance of the two subject subpoenas to Mr. Cicek. (See footnote 1, supra). Not only did the

6

attorneys fail to inform the Court, but they did not do so while successfully preventing Mr. Cicek from objecting, by moving *Ex Parte* for an Order seeking discovery under the Statute. Compounding such egregious behavior is that the attorneys' actions aided the Republic of Turkey in seeking information which likely will be used in an attempt to deprive Mr. Cicek of his liberty and property in a manner which is widely condemned internationally, and which presents the very real threat of torture, and the deprivation of Mr. Cicek's basic human rights.

C.     **The Persecution of Members of the Gulen Movement by the Republic of Turkey.**

The *Turkey 2018 Human Rights Report*, published by United States Department of State, Bureau of Democracy, Human Rights and Labor, outlined the Republic of Turkey's governmental response to an alleged coup attempt that occurred in July 2016. Included in the response was that authorities "dismissed or suspended more than 130,000 civil servants from their jobs, arrested or imprisoned more than 80,000 citizens, and closed more than 1,500 non-governmental organizations (NGOs) on terrorism-related grounds". (Berutti Cert., Ex. I, p.1) This was all done due to allegations of "ties to cleric Fethullah Gulen and his movement, accused by the government of masterminding the alleged coup attempt, and designated by the Turkish government as the 'Fethullah Terrorist Organization (FETO)'". (*Id.*)  Further:

> Human rights issues included reports of arbitrary killing;  suspicious deaths of persons in custody; forced disappearances; torture; arbitrary arrest and detention of tens of thousands of persons, including opposition members of parliament, lawyers, journalists, foreign citizens, and Turkish-national employees of the U.S. Mission to Turkey for purported ties to "terrorist" groups or peaceful legitimate speech; political prisoners, including numerous elected officials and academics; closure of media outlets and criminal prosecution of individuals for criticizing government policies or officials; blocking websites and content; severe restriction of freedoms of assembly and association; restriction of freedom of movement; and violence against women, and lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons, and members of other minorities."

(*Id.* pp. 1-2).

The report further discusses a wide variety of torture techniques; cruel and unusual punishment used in Turkey, and degrading treatment, all of which is prohibited by Turkish law. However, there continued to be ongoing to rising reports of individuals linked to the Gulen Movement being subject to torture and inhumane practices, including "brutal interrogation techniques aimed at extracting forced confessions and coercing detainees to incriminate others." (*Id.*, pp. 4-5).

In addition, the Republic of Turkey's legislature adopted new "antiterror legislation", pursuant to which a person could be detained without being charged for forty-eight (48) hours for an "individual" offense, and up to seventy-two (72) hours for a "collective" offense. Such periods could be extended twice with the approval of a judge, meaning that authorities could hold a person without a charge for up to six days for individual offenses, and up to twelve days for collective offenses. This has caused great concern for human rights organizations over the increase in torture of numerous persons, including foreign citizens. (*Id.*, p.10). Indeed, reports provide that many attorneys refused to take cases for any individuals charged with ties to the Gulen Movement for fear that they, themselves, would face prosecution. In addition, those defense attorneys who have braved the potential persecution for representing those allegedly associated with the Gulen Movement, have had their conversations with their clients recorded by prosecutors, and have been denied access to their clients' files for weeks and months, hampering their ability to defend their clients. (*Id.*, pp. 10-11).

The positions taken by the Republic of Turkey in extradition hearings of Gulen Movement members--much like this *Ex Parte* Petition which did not seek extradition--have been shams. An example is the case of three defendants who were previously arrested and to which the Republic of Turkey sought extradition from the United Kingdom. The Republic of Turkey

outlined numerous offenses of the defendants, who countered that the trial against them was solely politically motivated. (See Exhibit Q, *Ruling in the Matter of Talip Buyuk, Ali Celik, and Hamdi Akin Ipek*, November 28, 2018 [hereafter "*Buyuk*"]). The original Indictment against the three named defendants was over 2,000 pages long. As is the case here, in *Buyuk*, the Republic of Turkey utilized a "Dual Criminality Test" strategy, which alleged that the defendants committed two different sets of crimes, in an effort to have the three defendants extradited to Turkey. (*Id.* Q, p. 2, #2 and p. 3, #6). In pertinent part, the defendants argued that their prosecution was politically motivated; that it was impossible for them to receive a fair trial in Turkey; that the prison conditions in Turkey were in violation of both Turkish and international law; that they would suffer prejudicial/discriminatory treatment in custody if returned to Turkey; and that the Republic of Turkey's request was an abuse of process. (*Id.* p. 8, #38 and p. 10, #51).

The defendants called as an expert witness, Sir Jeffrey Jowell, a Professor of Law at University College London, a former member of the Venice Commission, the former head of the Bingham Centre on the Rule of Law, and a distinguished author on the Rule of Law in Turkey, who was knighted "for his services to Human Rights, Democracy, and the Rule of Law." ("Prof. Jowell") (*Id.* p. 11, #53). In summary, Prof. Jowell testified that the charges against the defendants were politically motivated, that there was overwhelming evidence that none of the defendants would receive a fair trial in Turkey, and that there was real risk that the defendants would suffer violations in respect to the anticipated treatment/detention within the Turkish prison system. (*Id.* p. 11, #55).

Prof. Jowell recounted the critical series of events occurring in Turkey in and after December 2013. He noted that on December 17, 2013, numerous suspects were arrested and detained, related to an investigation for bribery of public officials, and smuggling of large

quantities of gold out of the country. Among those arrested were three sons of Cabinet Ministers, a high-profile Mayor from the ruling political party, and the manager of Turkey's largest State-owned bank. The investigation revealed an incriminating telephone conversation between then-Prime Minister Recep Tayyip Erdogan (now President Erdogan), and his son, with the former instructing the latter to hide a large sum of money from investigators. Prof. Jowell testified that:

> with the onset of damaging corruption charges looming, the Turkish government reacted by alleging that the investigation was part of an attempted judicial coup instigated by what has been termed a 'parallel structure' inside the State of Turkey, which was orchestrated by followers of Fethulah Gulen. Mr. Erdogan called the FETO movement a terrorist organization, and vowed to locate and 'destroy' all of its members.

(*Id.* p 12, #56-58).

Prof. Jowell further testified that the next day, numerous police officers--many of them high-ranking--were summarily removed from their positions. On December 25, 2013, newly installed police officers summarily refused to carry out previously issued, and investigation-related, search warrants and arrest warrants, including one upon Erdogan's son. One prosecutor who publicly denounced the government for obstructing the investigation, was removed. "Important changes to certain aspects of criminal procedure were then hurriedly adopted," leading to an "extraordinary crackdown by the Turkish authorities." (*Id.* p.12, #62). Prof. Jowell then testified as to the "said corruption investigation" leading to the removal or relocation of tens of thousands of police officers, civil servants, judges, and prosecutors, "by reason of their purported support of and /or links to the Gulenist Movement." (*Id.* p. 12, #63).[3]

---

[3] Although the Republic of Turkey closed its investigation into the Erdogan-related corruption, the United States did not. The U.S. initiated a case against Reza Zarrab, who cooperated with U.S. authorities, leading to the conviction of Hakan Atilla. (See Berutti Dec., Exs. T and U).

The Court determined that Prof. Jowell gave persuasive testimony that there is "substantial evidence that this request [by the Turkish Government] is politically motivated" and "that there are real risks ... for all three defendants … by reason for their perceived political opinions." (See Exhibit Q, p.13, #66). The defendants then called a second witness, who remained anonymous with approval of the Court, to testify. "Witness A" testified that he "was a former member of the Turkish Judiciary who had fled the country fearing for his own safety". (*Id.* p. 13, #69). Witness A "provided the Court with a first-hand account of a number of measures imposed by the Turkish government in recent times that raised serious concerns." (*Id.* p. 13, #69). Witness A described "an unhealthy and unfair purge of the Judiciary" which involved:

> the removal of a considerable number of fellow Judges who were known to him (directly or indirectly), and who he continues to hold in high regard as being independent, reliable, and honest. He added that they were replaced by judges whose independence was compromised and who were obligated to do the bidding of the government.

(*Id.* p.14, #70). Witness A testified that he learned certain criminal charges were brought against him by the Turkish authorities, although he was unaware of the full details. He had no intention of returning to Turkey, and strenuously denied being a part of the Gulen Movement or any other movement or demonstration. Witness A stated that most of the judges that he worked with have been imprisoned since being arrested in July 2016, "on the pretext of terror charges", and that "most remain in solitary confinement". (*Id.* p.14, #73).

The Court took additional live witness testimony on behalf of the defendants, which was also found to be credible, after which the defendants rested their case. Then, on its own accord, the trial judge introduced his own document into evidence, about which he asserted:

> the Turkish Ministry of Justice has produced an important document dated 8th November 2018, which merits careful examination. I allowed this document to be

11

received into evidence after absorbing submissions from both parties as I was satisfied that it was in the interests of justice to do so.

(*Id.* p. 19, #102). The Judge relied on the hearsay document created by the Republic of Turkey for exactly such situations, to be read into the record for extradition trials like these which are brought against defendants who are being maliciously and falsely prosecuted in Turkey, at trials where the Turkish government is the judge, jury, prosecutor and defense attorney. The document provided, in effect, that there were a multitude of cases of acquittals for those accused of offenses connected to their alleged membership in FETO; appeals resulted in many reversals; and thus, the courts could not only rely on defense witnesses, statements, and evidence from the police, but they must seek and hear every piece of evidence. Thus, by using a self-serving, government-issued statement, dated 8th November 2018, the Republic of Turkey sought to defeat the live and powerful testimony of Prof. Jowell, Witness A, and others.[4]

In making the determination not to extradite the defendants back to Turkey, the Judge stated that "the evidence…satisfies me to the necessary standard that the decision to prosecute…was politically motivated (*i.e.* by reason of their actual or purported political views as alleged members and supporters of FETO) … each defendant will face a real risk of … ill treatment in the event of return, again by reason of their actual or perceived political opinions such that extradition must be **refused**." (*Id.* p. 21, 115). The Judge further raised "serious concerns about the prison conditions", "such as deliberate ill-treatment of prisoners by staff or fellow inmates." (*Id.* p. 22, #120). In addition, the Court found that there is "real and imminent risk" to the lives of the defendants if extradited, and also that the Turkish authorities were

_____

[4] The document later was effectively withdrawn by the Republic of Turkey. (See Berutti Dec., Ex. V).

12

"unable or unwilling to take appropriate preventative measures to reduce such risk" to the defendants. (*Id.* p. 21, #116).

The Republic of Turkey appealed this Order twice, once on March 5, 2019 (Berutti Dec., Ex. R), and again on April 9, 2019. (Berutti Dec., Ex. S). Both appeals failed.  But the concerted effort by the Republic of Turkey to overcome live testimony with a government-issued document excusing its own misconduct, and then twice appealing an adverse decision, demonstrates that the Republic of Turkey will stop at nothing to extradite alleged Gulen Movement supporters from foreign countries.

The criminal procedure against Mr. Cicek dates to July 2016.  A State of Emergency was declared by the Republic of Turkey on July 21, 2016. (Berutti Dec., Ex. J, p. 2). The United Nations notes that many of the twenty-two emergency Decrees promulgated thereafter bypassed the Legislature and Constitutional Court of the Republic of Turkey, and "fall short of basic human rights safeguards and Turkey's obligations under international law." (*Id.*) The Decrees allow those working within their framework on behalf of the government to behave with "impunity and lack of accountability by affording legal, administrative, criminal and financial immunity to administrative authorities." (*Id.*)  Meanwhile, the Decrees resulted in:

> arbitrary mass dismissals of civil servants and private sector employees; arbitrary closure of civil society organizations, including prominent human rights non-governmental organizations (NGOs) and media; arbitrary detention of people arrested under the state of emergency measures; the use of torture and ill-treatment during pretrial detention; restrictions of the rights to freedoms of expression and of movement; arbitrary expropriation of private property; and methods of collective punishment targeting family members of individuals suspected of offences under the state of emergency.

(*Id.*) Indeed, the United Nations further reports that one such Decree provided for dismissal of judges and prosecutors who were allegedly linked to the Gulen Movement. Thus, "a large number of judges and prosecutors were dismissed, arrested and detained since the failed coup

13

attempt; 4,240 Judges and prosecutors were dismissed through executive orders of the High Counsel of Judges and Prosecutors, and the Constitutional Court dismissed two of its judges." (*Id.*, pp. 12-13).

Further, by the time the U.N. Report was issued, at least 152,000 civil servants were dismissed; massive dismissals of teachers and academics linked to the Gulen Movement occurred; 159,506 arrests had been made under emergency Decrees; 1,719 "human rights, humanitarians, lawyers' associations, foundations, and NGO's" had been permanently closed, and "some 166 media outlets, including publishing houses, newspapers and magazines, news agencies, television stations and radios" were liquidated. Over 300 journalists were arrested and detained, approximately 100,000 websites were blocked, 50,000 passports were cancelled and some "570 lawyers were arrested, 1,480 faced some kind of prosecution and 79 were sentenced to long-term imprisonment". (*Id.* at 2-3).

The United Kingdom, in its *Country Policy and Information Note* on *Turkey: Gulenist Movement* (Berutti Dec., Ex. K, pp. 5-6), noted that the Gulen Movement is a term used to describe those who follow the United States-based Mr. Gulen; "the movement is not a political party, neither is it a religion. Gulen Movement supporters adhere to support for such things as interfaith dialogue, modern education, ethics in education, media, business, and public life," and opposition to using Islam as a political ideology. (*Id.*, pp. 16-17). The Gulen Movement "is believed to have a large number of sympathisers in Turkey; some estimate the number to be in the millions." Of great importance to Mr. Cicek's situation, which reasonably should strike tremendous fear in him, is the following:

> There have been reports of Turkish nationals living outside Turkey, who are suspected by the Turkish authorities of involvement in the Gulenist movement, having their passports cancelled and replaced with a one-day passport to use to return to Turkey to be tried. Teachers and the military appear to have been

> particularly affected. Others suspected of involvement in the Gulenist movement may be prevented from leaving Turkey. In June 2017, it was thought that 140,000 people had had their passports cancelled.

(*Id.*, p. 8). "Persecution" is how the conditions faced by those fleeing prosecution by the Republic of Turkey for their alleged ties to the Gulenist Movement have been described. (*Id.*) The UK Home Office noted further (*Id.* p. 16):

> The US DoS' International Religious Freedom report covering 2016 noted, 'The media estimate there may be from 200,000 to four million people influenced by the movement led by Muslim cleric Fethullah Gulen, which identifies itself as an Islam-inspired civic, cultural, and educational movement. In 2013 the BBC stated that the Gulenist movement had no formal structure, visible organization or official membership, but there were said to be millions of followers in Turkey. In 2000, *The Guardian* stated that Gulen had 'hundreds of thousands' of supporters.

Of great significance to this matter is that **"Fethullah Gulen has been living in exile in the U.S. since 1999. The Turkish government has asked the U.S. government to extradite him to Turkey."** (*Id.* p.18) (emphasis added). Although blaming Mr. Gulen for planning the purported coup attempt, "Mr. Gulen denied the claims and has condemned the coup." (*Id.* p. 20). "Some of those convicted of crimes against the state have no direct links to the coup attempt, but were jailed instead for protesting or expressing criticism of the increasingly authoritarian governing style of President Recep Tayyip Erdogan." (*Id.* p. 35). It is alleged that prison conditions in the Republic of Turkey have deteriorated to the point where "torture and mistreatment in prisons have also increased over the last year. Prisoners have reported being held in stress positions over prolonged periods, which also being subjected to sleep deprivation, beatings, sexual abuse, and threats of rape." (*Id.* p. 37) (See also p. 38, quoting an April 2017 *New York Times* article noting that those branded as 'Gulenists' are being subjected to "a lot of serious torture.")

The European Commission, in reviewing the Republic of Turkey's suitability for joining the European Union, assessed the Republic of Turkey (Berutti Dec., Ex. L). The Commission asserted that while it is appropriate to take action to support democratic institutions in the wake of the alleged coup attempt, "the broad scale and collective nature, and the disproportionality of measures taken since the attempted coup under the state of emergency, such as widespread dismissals, arrests, and detentions, continue to raise serious concerns." (*Id.* at p. 3). The European Commission continued (emphasis in original):

> Overall, over 150,000 people have been taken into **custody** since the state of emergency began. This included a large number of critical voices. Over 78,000 people have been arrested based on terror-related charges, of which, at the end of January 2018, 54,000 had been released pending trial with judicial control and 24,660 remained in pre-trial detention. Judicial processes involving suspected members of the Gulen movement and coup plotters raised serious questions about the respect of international standards. It is of particular concern that relatives of suspects were directly or indirectly targeted by a series of measures, including dismissal from public administration and confiscation or cancellation of passports. A set of unofficial criteria were relied upon to determine alleged links to the Gulen movement, including the attendance of a child at a school affiliated with the organization, the deposit of money in the bank affiliated with the organization or the possession of the mobile messaging application By Lock.

Freedom House, in its report *Freedom in the World 2019*, placed the Republic of Turkey in the company of Russia, China, Iran, and Saudi Arabia as having "recently targeted political dissidents abroad with practices such as harassment, extradition requests, kidnapping, and even assassination." (Berutti Dec., Ex. M, p. 6)**. It further noted that the Republic of Turkey "has *by its own account* captured 104 of its citizens from 21 countries in the last two years in a global crackdown on perceived enemies of the state."** (*Id.*) (emphasis added).

Meanwhile, the World Justice Project ("WJP"), in its *Rule of Law Index 2019* (Berutti Dec., Ex. N), presents a portrait of the rule of law in 126 countries by providing scores and rankings based on eight factors: constraints on government powers, absence of corruption, open

16

government, fundamental rights, order and security, regulatory enforcement, civil justice, and criminal justice, (*Id.* Introduction). The country scores and rankings are derived from more than 120,000 household surveys and more than 3,800 expert surveys in 126 countries and jurisdictions. The Index is the world's most comprehensive database of its kind, and the only one to rely principally on primary data, measuring countries' adherence to the rule of law from the perspective of ordinary people and their experiences. (*Id.*). **WJP ranked the Republic of Turkey as number 109 out of 126 countries in overall score for following the rule of law, *behind even Iran*.** Of the thirteen nations of the Eastern Europe & Central Asia Region, WJP ranked the Republic of Turkey last. (*Id.* p.18). And in the rankings for "Constraints on Government Powers", the Republic of Turkey ranked number 123 out of 126, **ahead of only Cambodia, Nicaragua, and Venezuela.** (*Id.* p. 22).

> The Republic of Turkey ranked 122 of 126 in Fundamental Rights, which:
>
> recognizes that a system of positive law that fails to respect core human rights established under international law is at best 'rule by law' and does not deserve to be called a rule of law system. Since there are so many other indices that address human rights, and as it would be impossible for the Index to assess adherence to the full range of rights, this factor focuses on a relatively modest menu of rights that are firmly established under the Universal Declaration of Human Rights and are most closely related to rule of law concerns.

(*Id.*, p. 25). In the WJS breakdown of questions from Turkey's individualized household survey, only 8.6 percent of those surveyed believed that there was "no improper government influence" in the government; less than half of those surveyed believed there was due process of law; and only one-third of those surveyed believed that there was no discrimination in the government. Further, most people felt that there was discrimination of their "fundamental rights", such as freedom of expression, and religion, right to privacy, and freedom of association. (*Id.* p. 147).

17

Human Rights Watch reports that of the 48,924 Turks who were imprisoned on terrorism charges, "34,241 were held for alleged Gulenist (FETO) links …" (Berutti Dec., Ex. O, p.2). Further, Human Rights Watch asserts (p. 6):

> Turkish authorities continued to seek the extradition of alleged Gulen supporters, many of them teachers, from countries around the world. Without adhering to legal due process, security services in countries including Kosovo and Moldova cooperated with Turkish agents during the year to apprehend and transfer Turkish citizens to Turkey where they were detained and prosecuted.

None of this was disclosed to the Court in the Petition. Rather, review of the Declaration of Viren Mascarenhas and the supporting Brief may reasonably lead the reader to believe that Mr. Cicek is a New Jersey resident who is part of a small, radical, and dangerous group which needs to be brought to justice. The Republic of Turkey and its attorneys flipped the truth on its head so as to create terror in the victim, not to aid in eliminating terror.

## LEGAL ARGUMENT

## POINT I

### THE ORDER GRANTING THE REPUBLIC OF TURKEY THE RIGHT TO SERVE SUBPOENAS SHOULD BE VACATED, PURSUANT TO *FED . R. CIV. P.* 60(B), DUE TO ITS FRAUDS, MISREPRESENTATION, AND MISCONDUCT, AND THAT OF ITS ATTORNEYS, AND THE LACK OF DUE PROCESS AFFORDED MR. CICEK.

The Order granting the Republic of Turkey a right to serve subpoenas was a fraud on the Court perpetrated by both the Republic of Turkey itself, and probably it attorneys. As a result, the *Ex Parte* Order permitting service of subpoenas on Mr. Cicek, pursuant to the Statute, should be vacated pursuant to *Fed. R. Civ. P.* 60(b).

Pursuant to *Fed. R. Civ. P.* 60(c), "[a] motion under Rule 60(b) must be made within a reasonable time--and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." As the Order was entered on December 9, 2019, this motion is brought in ample time. *Fed. R. Civ. P.* 60(b)(3) provides: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for … fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."[5]

> While Rule 60(b)(3) clearly requires the moving party to "show that the adverse party committed a deliberate act that adversely impacted the fairness of the relevant legal proceeding [in] question," *Jordan*, 1996 WL 528950, at *6, neither the rule itself nor its official commentary provide a specific definition of "fraud." Likewise, this Court and the Supreme Court have never identified with precision what constitutes "fraud" for purposes of seeking relief under Rule 60(b)(3). See *id.* at *6 (failing to define fraud for purposes of Rule 60(b)(3), but indicating that "'fraud' can be interpreted as reaching deliberate omissions when a response is required by law or when the nonmoving party has volunteered information that would be misleading without the omitted material").

---

[5] We note that the *Ex Parte* Order is final, as following its entry and service of subpoenas on Mr. Cicek based on the authority granted thereby, this case was terminated on January 10, 2020.

*Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 455 (6th Cir. 2008).

"A litigant who has engaged in misconduct is not entitled to 'the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent.'" *Seaboldt v. Pennsylvania R. Co.*, 290 F.2d 296, 300 (3d Cir. 1961) (quoting *Minneapolis, St. Paul & S.S. Marie Ry. Co. v. Moquin*, 283 U.S. 520, 521-522 (1931). "In order to sustain the burden of proving fraud and misrepresentation under Rule 60(b)(3), the evidence must be clear and convincing." *Floorgraphics Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 434 Fed. Appx. 109, 111 (3d Cir. 2011) (citing *Brown v. Pennsylvania Railroad Company*, F.2d 522, 527 (3d Cir. 1960)). When evaluating Rule 60(b)(3) motions, the 6th Circuit employed "the following general definition of fraud: Fraud is the knowing misrepresentation of a material fact, or concealment of the same when there is a duty to disclose, done to induce another to act to his or her detriment." *Info-Hold, Inc.*, supra, 538 F.3d at 456.

In the case *sub judice*, the Republic of Turkey and, probably, its attorneys, knowingly failed to disclose that the Republic of Turkey has issued criminal process allowing authorities to engage in wide-reaching searches and seizures both of Mr. Cicek and his personal property, based on the formal criminal accusation that he is a terrorist who supports the Gulen Movement. Such searches and seizures of persons and things are part of a worldwide persecution in which the Republic of Turkey is engaged against tens of thousands of other suspected supporters of the Gulen Movement around the globe. Thus, Mr. Cicek's very liberty has been threatened under the guise of a third-party subpoena arising from an international arbitration--an international arbitration in which the criminal accusations against Mr. Cicek' by the Republic of Turkey are almost certainly in issue. And the same attorneys represent the Republic of Turkey in that action, as represent the Republic of Turkey (*pro hac vice*) in this action. Thus, assuming the correctness

of the belief that they are fully aware of the criminal complaints lodged by their client against

Mr. Cicek, they knowingly committed a fraud of omission on the Court.[6]

The Statute provides, in pertinent part, as follows (emphasis added):

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted *before formal accusation*. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

**A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.**

Here, evidence supports that Mr. Cicek has been formally accused of being a criminal

"terrorist" member of the Gulen Movement.  The information sought in this action is but a 'back

door' to obtain documents and testimony which may incriminate Mr. Cicek vis-à-vis the criminal

accusations made against him by the Republic of Turkey, which will certainly want to extradite

him. Such effort is improper, and it circumvents the Treaty.  Further, the subpoenas attempt to

---

[6] We understand the arbitration to be subject to confidentiality.  Yet the arbitration purportedly served as basis for the Order, the Petition in support of which, Mr. Cicek alleges, falsely describes the Gulen Movement and his purported ties to it--thus making him appear to be a terrorist. Consequently, King & Spalding should be compelled immediately to turn over all of the arbitration submissions so that an informed assessment can be made as to whether they purposely failed to disclose their knowledge of the criminal proceedings against Mr. Cicek. If confidentiality is critical, such submissions can be turned over for *in camera* review by the Court.

compel Mr. Cicek to give evidence against himself.  While the Fifth Amendment right against self-incrimination does not apply to testimony which legitimately may lead to incrimination in a foreign jurisdiction, *U.S. v. Balsys*, 524 U.S. 666 (1998), New Jersey has not determined whether the limitation of *Balsys* applies to residents within the State. "There is no counterpart in the New Jersey Constitution to the 5th Amendment of the U.S. Constitution." Biunno, Weissbard & Zegas, *Current N.J. Rules of Evidence (GANN),* Comment 1 to Rule 503.

> In New Jersey, the privilege is derived from the common law and is codified in our statutes and rules. *State v. Reed*, 133 N.J. 237, 250 (1993); see *N.J.S.A.* 2A:84A–19; *N.J.R.E.* 503. Its importance is not diminished by the lack of specific constitutional articulation; rather, from colonial times, "New Jersey has recognized the right against self-incrimination and has consistently and vigorously protected that right." *Reed*, supra, 133 N.J. at 250.

*State v. P.Z.*, 152 N.J. 86, 101 (1997). The State recognized "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own free will, and to suffer no penalty ... for such silence.'" *State v. Camacho*, 218 N.J. 533, 543 (2014) (quoting *P.Z.*). In *State v. Strong*, 110 N.J. 583, 595 (1988), the New Jersey Supreme Court expressed that the privilege against self-incrimination in the State is broader than that provided under the 5th Amendment, writing (emphasis added):

> We conclude therefore that the fifth amendment mandates the strictest scrutiny of and the strongest protections against possible prosecutorial misuse of testimony with respect to a witness who had earlier been compelled to testify under the grant of immunity. **We add that our state-law privilege against self-incrimination is, if anything, more protective than the fifth amendment**.

Thus, it is reasonable to assume that the New Jersey Supreme Court would determine the question of whether the privilege applies in favor of those reasonably in fear of foreign criminal prosecution in a manner closer to Justice Ginsburg's dissent in *Balsys*, supra, 524 U.S. at 701–02 (R.B. Ginsburg, J., dissenting) (emphasis added):

**The privilege against self-incrimination, "closely linked historically with the abolition of torture," is properly regarded as a "landmar[k] in man's struggle to make himself civilized."** E. Griswold, *The Fifth Amendment Today* 7 (1955); see *id.*, at 8 (Fifth Amendment expresses "one of the fundamental decencies in the relation we have developed between government and man"). In my view, the Fifth Amendment privilege against self-incrimination prescribes a rule of conduct generally to be followed by our Nation's officialdom. It counsels officers of the United States (and of any State of the United States) against extracting testimony when the person examined reasonably fears that his words would be used against him in a later criminal prosecution. **As a restraint on compelling a person to bear witness against himself, the Amendment ordinarily should command the respect of United States interrogators, whether the prosecution reasonably feared by the examinee is domestic or foreign.** Cf. *DKT Memorial Fund Ltd. v. Agency for International Development*, 887 F.2d 275, 307–308 (C.A.D.C.1989) (R.B. Ginsburg, J., concurring in part and dissenting in part) ("just as our flag carries its message ... both at home and abroad, so does our Constitution and the values it expresses") (citation and internal quotation marks omitted); *United States v. Tiede*, 86 F.R.D. 227 (U.S. Ct.Berlin 1979) (foreign national accused of hijacking Polish aircraft abroad was tried under German substantive law in Berlin in a court created by United States; U.S. court held foreign national entitled to jury trial as a matter of constitutional right). **On this understanding of the "fundamental decenc[y]" the Fifth Amendment embodies, "its expression of our view of civilized governmental conduct,"** *Griswold*, supra, at 8, 9, I join Justice BREYER's dissenting opinion.

Similarly, it is reasonable to assume that the New Jersey Supreme Court would concur with Justice Breyer (joined by Justice Ginsburg), who dissented in *Balsys*, in pertinent part, as follows (*Id.* at 702-03 (S. Breyer, J., dissenting) (bolded emphasis added):

Were Aloyzas Balsys to face even a theoretical possibility that his testimony could lead a State to prosecute him for murder, the Fifth Amendment would prohibit the Federal Government from compelling that testimony. The Court concludes, however, that the Fifth Amendment does not prohibit compulsion here because Balsys faces a real and substantial danger of prosecution not, say, by California, but by a foreign nation. **The Fifth Amendment, however, provides that "[n]o person ... shall be compelled in *any* criminal case to be a witness against himself."** *U.S. Const., Amdt.* 5 (emphasis added). This Court has not read the words "any criminal case" to limit application of the Clause to only federal criminal cases. See *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964). That precedent, as well as the basic principles underlying the privilege, convince me that **the Fifth Amendment's privilege against self-incrimination should encompass not only feared domestic prosecutions, but also feared**

**foreign prosecutions where the danger of an actual foreign prosecution is substantial**.

Moreover, regardless of whether New Jersey provides Mr. Cicek a right not to provide evidence against himself related to criminal proceedings in a foreign jurisdiction, he maintains the absolute constitutional right against having to provide such testimony under the Turkish Constitution. (Berutti Dec., Ex. C). Specifically, Article 38/5 of the Turkish Constitution explicitly provides that **"No one shall be compelled to make a statement that would incriminate himself/herself or his/her legal next of kin, or to present such incriminating evidence."** (emphasis added).

Certainly, the subpoenas thus attempt to compel Mr. Cicek to provide documents and to give testimony against himself, although he is the subject of criminal accusations in Turkey, in violation of the legally applicable privilege with respect to the Republic of Turkey's prosecution of its own citizens. Under such circumstance, Mr. Cicek cannot be compelled to give testimony or provide documents that may be used by the Republic of Turkey in such prosecution. The failure of the Republic of Turkey and its attorneys to reveal Mr. Cicek's fundamental right against self-incrimination enshrined within the Turkish Constitution is yet another revelation that the Order was entered, based on fraud, misrepresentation, and misconduct, which caused the Statute to be misapplied. Thus, at present, Mr. Cicek has been compelled by the resulting subpoenas to give testimony and to provide documents in violation of the privileges that the Constitution of Turkey and, it is submitted, New Jersey's statutes and laws (see, e.g. *N.J.R.E.* 503; *N.J.S.A.* 2A:84A-19), provide him--which is directly contradictory of the right to relief pursuant to the Statute.

Further, in its application, the Republic of Turkey asserted that pursuant to *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), it satisfied discretionary factors which must

be considered for relief under the Statute. However, given the criminal proceedings pending against Mr. Cicek, those factors could not have been satisfied had there been full disclosure. As noted in *In re Lazaridis*, 865 F. Supp. 2d 521, 526 (D.N.J. 2011), the four discretionary factors of *Intel Corp.* are found at 542 U.S. 264–65, and are the following (emphasis added):

> Additionally, a court can consider four discretionary factors in deciding whether to grant a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding, such that the discovery is accessible without the aid of § 1782; (2) the nature of the foreign tribunal, the character of the foreign proceedings, and the receptivity of the foreign government or court to accept U.S. federal court assistance; (3) **whether the § 1782 request conceals an attempt to circumvent foreign proof gathering restrictions**; and (4) whether the subpoena is unduly burdensome.

The Republic of Turkey and its attorneys knew, or should have known, of the formal criminal accusations made against Mr. Cicek and, thus, were obligated to disclose all such material facts in support of its *Ex Parte* application pursuant to 28 U.S.C. § 1782 (the "Statute"). See, e.g., *Fed. R. Civ. P.*   11(b) (Representations to the Court); *N.J.R.P.C.* 3.1 (Meritorious Claims and Contentions); *N.J.R.P.C.* 3.3 (Candor Toward the Tribunal); *N.J.R.P.C.* 3.4 (Fairness to Opposing Party and Counsel). Instead, the Republic of Turkey, through its attorneys, knowingly sought and obtained an *Ex Parte* discovery Order, despite the Statute's specific prohibition against its application to third parties formally accused of criminal conduct.

The actions of the Republic of Turkey and its attorneys in obtaining the *Ex Parte* Order plainly were fraudulent, were based on material omissions and/or misrepresentations, and were the product of misconduct. The truth was concealed from the Court. Such conduct is both shocking and unconscionable. Further, such efforts have threatened Mr. Cicek's liberty and property interests, which under the circumstances of the Republic of Turkey's actions worldwide, is terrifying and beastly. Thus, the failure of the Republic of Turkey and its attorneys

to reveal the formal criminal actions against Mr. Cicek clearly and convincingly constituted a material omission and, thus, was fraudulent as defined by *Fed. R. Civ. P.* 60(b)(3).

The Republic of Turkey could not legally have succeeded in its *Ex Parte* application. Further, the Republic of Turkey unquestionably is attempting to circumvent foreign proof gathering restrictions, given the Treaty's existence. The Republic of Turkey and its attorneys have sought this 'back door' discovery from Mr. Cicek because they would not be able to obtain such discovery had they utilized proper legal channels in an attempt to gather information and testimony from Mr. Cicek.   Specifically, the Treaty provides, at Article 22, titled "Refusal of Mutual Assistance", in pertinent part (emphasis added):

(1)    Judicial assistance may be refused:

(a) If the investigation or proceedings concern:

**(i)    An offense which the Requested Party considers to be a political offense or an offense connected with a political offense.**

(Berutti Dec., Ex. H). The United States plainly views the prosecution of purported supporters of the Gulen Movement to be persecution, as do all civilized governments. Thus, the political nature of the alleged crimes would not have been given aid and comfort by our Federal government, the same way our Federal government has not extradited Mr. Gulen himself.

Compounding the fraudulent nature of the Republic of Turkey and its attorneys' actions is that they pursued the Order *Ex Parte*, such that Mr. Cicek did not have an opportunity to oppose entry of the Order in the first instance. The Statute does not provide that such a final Order may be entered without notice. Thus, although the Order specifies that Mr. Cicek may seek modification or vacation of such Order, it should not have been entered in the first instance without the Court hearing from Mr. Cicek following his being served, and being provided reasonable notice with opportunity to object.

26

In *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (emphasis added), the United States Supreme Court held:

> For more than a century the central meaning of procedural due process has been clear: **'Parties whose rights are to be affected are entitled to be heard**; and in order that they may enjoy that right they must first be notified.' *Baldwin v. Hale*, 1 Wall. 223, 233. See *Windsor v. McVeigh*, 93 U.S. 274; *Hovey v. Elliott*, 167 U.S. 409; Grannis v. Oredean, 234 U.S. 385. **It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'** *Armstrong v. Manzo*, 380 U.S. 545, 552.

Yet here, an Order was entered without any notice being given to Mr. Cicek in advance thereof, such that he had no opportunity to object to such relief. Thus, the Order justly should also be set aside pursuant to *Fed. R. Civ. P.* 60(b)(6), since the lack of due process constitutes a "reason that justifies relief", and otherwise renders the Order void, such that application of *Fed. R. Civ. P.* 60(b)(4) applies. See *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010) ("*Rule* 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard.").

Had Mr. Cicek been afforded his rightful opportunity to oppose entry of the Order, the Court would have been educated on why the Republic of Turkey cannot be trusted to be forthright with the Court. By allowing the Republic of Turkey to obtain documentary and testimonial evidence from Mr. Cicek, the Republic of Turkey and its attorneys have deputized this Court, which is acting unwittingly due to the Petitioner's material omissions, through its attorneys, to aid in a world-condemned persecution of potentially millions of alleged supporters of the Gulen Movement. Even if there were not already formal criminal accusations made against Mr. Cicek, the evidence of the Republic of Turkey's widespread human rights abuses could have been considered as a discretionary factor prior to the Court making the determination

of whether to grant an Order pursuant to the Statute. As noted by the Ninth Circuit Court of

Appeals:

> The language of § 1782 itself does not provide specific guidance to district courts in exercising such discretion. The accompanying legislative history, however, does articulate several factors that district courts may consider in deciding whether to grant assistance under the statute: **"[T]he court may take into account the nature and attitudes of the government of the country from which the request emanates and the character of the proceedings in that country."** S.Rep. No. 88–1580, 88th Cong., 2d Sess. (1963), reprinted in 1964 U.S.C.C.A.N. 3782, 3788.

*United States v. Sealed 1, Letter of Request for Legal Assistance from the Deputy Prosecutor*

*Gen. of the Russian Fed'n*, 235 F.3d 1200, 1206 (9th Cir. 2000) (emphasis added).

Under the circumstances, there is no room to believe that the Republic of Turkey acted in

good faith. The *Ex Parte* Order was entered based on the Republic of Turkey and its attorneys'

fraud, misrepresentation, and misconduct, and was entered without notice to Mr. Cicek. Had the

Republic of Turkey been forthcoming, and/or had Mr. Cicek been given the opportunity to

oppose the application as should have occurred, it would have been clear that the Order should

not have been entered as a matter of law (given existing criminal accusations and/or the Treaty)

and/or as a matter of discretion (the nature of the regime seeking the information). Thus, the

Order must be vacated pursuant to *Fed. R. Civ. P.* 60(b)(3), (4), and/or (6).

## POINT II

## THE SUBPOENAS SHOULD BE QUASHED.

To the extent that the Order may not be vacated pursuant to *Fed. R. Civ. P.* 60(b), the subpoenas should be quashed pursuant to *Fed. R. Civ. P.* 45(d)(3), since they require disclosure of privileged material, and otherwise are unduly burdensome.

*Fed. R. Civ. P.* 45(d)(3) provides, in pertinent part, that subpoenas must be quashed where they require "disclosure of privileged or other protected matter, if no exception or waiver applies"; or "subjects a person to undue burden."

"If the subpoenaed nonparty ... asserts that disclosure would subject it to undue burden under Rule 45(d)(3)(A), it must show that disclosure will cause it a 'clearly defined and serious injury.'" *State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic, P.C.*, 315 F.R.D. 220, 224 (E.D. Mich. 2016). In *In re. Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 239 (E.D. Pa. 2014), the Court recently examined the factors used in determining whether the subpoenaed request should be quashed under *Fed. R. Civ. P.* 45(d)(3):

> [When] the subpoenaed nonparty demonstrates a "clearly defined and serious injury" for a claim of undue burden under *Rule* 45(d)(3)(A), the Court conducts a balancing test, discussed below, in which it weighs the subpoenaing party's interest in disclosure and the subpoenaed nonparty's interest in non-disclosure to determine whether the burden on the subpoenaed nonparty is, in fact, undue. If the subpoenaed nonparty demonstrates a "clearly defined and serious injury" for a claim of protection under *Rule* 45(d)(3)(B), an additional step is required. The burden shifts to the subpoenaing party to show "a substantial need for the testimony or material that cannot be otherwise met without undue hardship," *Fed.R.Civ.P.* 45(d)(3)(C)(i), and demonstrate "that the subpoenaed [nonparty] will be reasonably compensated," *id.* 45(d)(3)(C)(ii). If the subpoenaing party makes this showing of substantial need, the Court then weighs the interests in the disclosures.
>
> This balancing test requires a Court to weigh (1) the relevance, (2) need, (3) and confidentiality of the requested materials, as well as (4) the harm that compliance would cause the subpoenaed nonparty. *Mannington Mills, Inc. v. Armstrong*

*World Indus., Inc.*, 206 F.R.D. 525, 529 (D.Del.2002) ("[E]ven if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit."). A court should be "particularly sensitive to weighing the probative value of the information sought against the burden of production on [a] nonparty." *Fears v. Wilhelmina Model Agency, Inc.*, Case No. 02–cv–4911, 2004 WL 719185, at *1 (S.D.N.Y. Apr. 1, 2004).

Here, the Republic of Turkey and its attorneys served subpoenas which would compel Mr. Cicek to give evidence against himself vis-à-vis Turkish criminal proceedings, under the guise of having a need for such documents in a foreign arbitration. Mr. Cicek has amply demonstrated the dangers he faces should he be compelled to respond to the subpoenas despite their noted contradiction of his rights against self-incrimination in the Republic of Turkey and, probably, the State of New Jersey. No reason can be given by the Republic of Turkey which supports the contention that its need for such information for the arbitration eclipses Mr. Cicek's rights as set forth above, either from the perspective of "need", or from the perspective of a applying a balancing test of prospective harm versus need.

## CONCLUSION

Based on the foregoing, the Order should be vacated as it is based on the fraud, misrepresentations and misconduct of the Republic of Turkey. Further, Mr. Cicek was denied due process since he was not provided notice of the *Ex Parte* Petition, or a right to be heard in objection thereto. Had he been provided with such an opportunity, Mr. Cicek would have been able to demonstrate that the Statute and Treaty prohibited entry of the Order, and that the nature of the Republic of Turkey's conduct, vis-à-vis alleged associates of the Gulen Movement, was reason for the Court not to exercise its broad statutory discretion. Thus, the Order should be vacated, and the Petition dismissed, pursuant to *Fed. R. Civ. P.* 60(b).

Alternatively, the subpoenas should be quashed, pursuant to *F. Fed. R. Civ. P.* 45(d)(3), since they require Mr. Cicek to disclose privileged information, and are otherwise unduly burdensome.

Respectfully submitted,

**WEINER LAW GROUP LLP**

By: s/ *Ronald A. Berutti*
      Ronald A. Berutti
      A Member of the Firm
      629 Parsippany Road
      P.O. Box 438
      Parsippany, NJ 07054-0438
      Phone (973) 403-1100
      rberutti@weiner.law

Dated: January 20, 2020

1735925_1.doc

31