# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **EX PARTE PETITION OF THE REPUBLIC OF TURKEY FOR AN ORDER DIRECTING DISCOVERY FROM HAMIT CICEK, PURSUANT TO 28 U.S.C. § 1782.** | **Civil Action No. 2:19-cv-20107-ES-SCM** |

## MEMORANDUM OF LAW IN OPPOSITION TO THE REPUBLIC OF TURKEY'S SECOND PETITION SEEKING TO COMPEL DISCOVERY PURSUANT TO 28 U.S.C. § 1782

**WEINER LAW GROUP LLP**
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054-0438
Phone (973) 403-1100
rberutti@weiner.law
Attorneys for Interested Party, Hamit Cicek

Of Counsel and on the Brief:
Ronald A. Berutti

## TABLE OF CONTENTS

**Page**

**Contents**

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 4

    A.   The Crimes for Which Hamit Cicek Has Been Charged. ................................................ 4

    B.   Mr. Cicek's Absolute Constitutional Right Against Testimonial and Documentary Self-Incrimination Under the Turkish Constitution. ............................... 6

    C.   The Treaty of Extradition and Mutual Assistance in Criminal Matters. ........................ 7

    D.   The Persecution of Members of the Gulen Movement by the Republic. ........................ 8

LEGAL ARGUMENT ................................................................................................ 21

POINT I: THE REPUBLIC HAS FAILED TO SUBMIT ADMISSIBLE EVIDENCE WHICH SUPPORTS ITS PETITION, SUCH THAT THE PETITION MUST BE DENIED................. 21

POINT II: THE STATUTE PRECLUDES THE REQUESTED RELIEF GIVEN THE FORMAL CRIMINAL CHARGES AGAINST MR. Cicek. ....................................................... 27

POINT III: MR. CICEK'S TURKISH RIGHT AGAINST SELF-INCRIMINATION IS ABSOLUTE.............................................................................................................. 29

POINT IV: EVEN IF A STANDARD STATUTORY ANALYSIS MUST BE EMPLOYED, THE PETITION MUST BE DENIED........................................................................ 32

POINT V: THE REPUBLIC SEEKS TO VIOLATE ITS TREATY OBLIGATIONS WITH THE PETITION.......................................................................................................... 39

CONCLUSION.......................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Beunick v. LeFebvre*,
 684 F. App'x 200 (3d Cir. 2017).................................................................. 22

*Davis v. Michigan Dept. of Treasury*,
 489 U.S. 803 (1989)................................................................................ 28

*F.D.A. v. B & W Tobacco Corp.*,
 529 U.S. 120 (2000)................................................................................ 28

*Fatin*,
 12 F.3d at 1240 ..................................................................................... 36

*FTC v. Mandel Brothers, Inc.*,
 359 U.S. 385 (1959)................................................................................ 28

*Gustafson v. Alloyd Co.*,
 513 U.S. 561 (1995)................................................................................ 28

*In re Application for an Order Pursuant to 28 U.S.C. 1782 to*
 *Conduct Discovery for Use in Foreign Proceedings*,
 773 F.3d 456 (2d Cir. 2014) ..................................................................... 27

*In re Bayer AG*,
 146 F.3d at 191 (3rd Cir. 1998) ........................................................... 32, 33

*In re Ex Parte Application of Societe d'Etude de Realisation et*
 *d'Exploitation Pour le Traitement du Mais*,
 No. 13-mc-0266, 2013 WL 6164435, at *3 (E.D. Pa. Nov. 22,
 2013) ................................................................................................... 28

*In re Gianasso*,
 No. C 12-80029 MISC SI, 2012 WL 651647, at *1 (N.D. Cal.
 Feb. 28, 2012) ...................................................................................... 28

*In re O'Keeffe*,
    No. CIV.A. 14-5835 WJM, 2015 WL 540238, at *4 (D.N.J. Feb.
    10, 2015) ................................................................................................................ 22

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241(2004)..................................................... 30, 32, 33, 35, 37, 38

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004)............................................................................ 28

*Lin v. INS*,
    238 F.3d 239 (3d Cir.2001) ................................................................ 36

*Lukwago v. Ashcroft*,
    329 F.3d 157 (3d Cir. 2003) .............................................................. 36

*Matter of Talip Buyuk, Ali Celik, and Hamdi Akin Ipek*,
    November 28, 2018.................................................................... 10, 21

*Neale v. Volvo Cars of N. Am., LLC*,
    No. 2:10-CV-04407 DMC, 2013 WL 5676640, at *2 ........................... 22

*United States v. Sealed 1, Letter of Request for Legal Assistance
    from the Deputy Prosecutor Gen. of the Russian Fed'n*,
    235 F.3d 1200 (9th Cir. 2000) ............................................................ 35

**Statutes**

28 *U.S.C.* § 1746.................................................................................. 22

S.Rep. No. 88–1580, 88th Cong., 2d Sess. (1963), reprinted in
    1964 U.S.C.C.A.N. 3782, 3788 ........................................................ 35

**Other Authorities**

*Country Policy and Information Note* on *Turkey: Gulenist
    Movement*........................................................................................ 16

*Freedom in the World 2019* ................................................................. 19

*New York Times* .................................................................................. 18

*Rule of Law in Turkey* ............................................................................................... 11

*Rule of Law Index 2019* ........................................................................................... 19

*The Guardian* .......................................................................................................... 17

*Turkey 2018 Human Rights Report* ........................................................................... 8

**Rules**

*Fed. R. Evid.* 602 .................................................................................................... 22

*L.Civ.R.* 7.2(a) ......................................................................................................... 22

**Treatises**

Treaty of Extradition and Mutual Assistance in Criminal Matters,
    32 U.S.T. 3111 ..................................................................................................... 7

**Constitutional Provisions**

Article 12/1 of the Turkish Constitution ...................................................................... 6

Article 309/1 of the Turkish Criminal Code ................................................................. 4

Article 314/1 of the Turkish Criminal Code ................................................................. 4

Article 38/5 of the Turkish Constitution .......................................................... 2, 7, 25, 30

U.S. Constitution ....................................................................................................... 8

## PRELIMINARY STATEMENT

This is a case of first impression. The Republic of Turkey ("Republic")
seeks an Order compelling discovery from Hamit Cicek ("Mr. Cicek") pursuant to
28 U.S.C. § 1782 (the "Statute"), which precludes relief after "formal accusation"
of a crime. Mr. Cicek has been granted indefinite political asylum by the U.S.
resulting from his being persecuted by the Republic. Without precedent, the
Republic seeks civil discovery from an American resident against whom it has
pending criminal charges, but under the guise of a civil arbitration proceeding to
which Mr. Cicek is not a party. Meanwhile, after initially concealing such fact, the
Republic now admits that it will use any discovery it obtains to aid in its ongoing
criminal prosecutions of Mr. Cicek. Mr. Cicek faces potential life imprisonment
and permanent confiscation of his already-seized assets if convicted. Thus, the
Republic's Petition truly serves dual purposes.

Per this Court's Order, the Republic was to explain the relevance of the
criminal charges pending against Mr. Cicek to its Petition. The Republic has
instead rehashed its prior submissions without providing any admissible evidence
to explain the relevance of the discovery to its pending criminal charges.
Specifically, the Republic relies exclusively on a Declaration of its arbitration
attorney who is unlicensed in Turkey, and who has no actual knowledge of the
criminal proceedings or of Mr. Cicek's rights under the Turkish Constitution. The

Republic and its attorneys know better. In the past when required to explain how it would safeguard evidence obtained in the arbitration from use by criminal authorities (D.E. 36), the Republic relied on a licensed Turkish attorney. (D.E. 39-4). That attorney confirmed that Mr. Cicek's Turkish law expert, Mehmet Tahsin, correctly asserted that the Republic was legally required to turn over such information for use in the Republic's criminal cases against Mr. Cicek. The Republic has also not challenged Mr. Tahsin's assertion that the documents being sought are directly relevant to the criminal charges against Mr. Cicek.

A petition may not be granted when the requesting party maintains pending criminal charges against the person from whom discovery is sought. While some cases have allowed discovery *from third parties about an individual already charged with a crime*, not a single case exists in which a party seeks *direct discovery from the individual it has already charged with a crime*.

The Petition also must be denied since the Statute precludes discovery from from Mr. Cicek, who has an *absolute right against self-incrimination* under Article 38/5 of the Turkish Constitution with respect to both testimonial and documentary incrimination, as affirmed by Mr. Tahsin.

Moreover, by using the Statute to obtain information which the Republic admits will be used in aid of prosecuting Mr. Cicek for formal criminal charges, the Petition is an improper effort to avoid the Republic's treaty obligations with the

U.S. The U.S. has condemned the Republic's treatment of those like Mr. Cicek, who the Republic perceives to be supporters of the cleric Fettulah Gulen (who himself has lived peacefully in exile in the United States since 1999). The Republic has resorted to well-documented torture, imprisonment, elimination of a free press, and the elimination of an impartial judiciary and police force, among other things related to its stated objective of eliminating the "Gulen Movement", which may have millions of supporters. Due process is impossible for Mr. Cicek in the Republic, whose abysmal human rights record now falls below that of even Iran, according to at least one international human rights organization. The treaty provides the method by which the Republic must seek evidence from a U.S. resident which will aid in its criminal prosecution of that resident. Given that the Republic's efforts against Mr. Gulen's alleged supporters do not meet the approval of the U.S. Department of State, it is highly likely that a request for mutual assistance in gathering evidence to support the politically-motivated criminal prosecution of Mr. Cicek would be rejected, even if Mr. Cicek had not been granted political asylum in the U.S. because of the Republic's persecution of him.

Finally, even if there was reason to apply the standard statutory analysis to the Petition, which under the circumstances there is not, the dual nature of the discovery request and the nature of the regime seeking such discovery militates against granting the Petition.  Thus, the Petition must be denied.

## STATEMENT OF FACTS

**A.**   **The Crimes for Which Hamit Cicek Has Been Charged.**

On March 8, 2018, criminal case no. 2018/82 Mr. Cicek was formally charged with (i) establishing and running an armed terrorist organization (i.e. FETO/PDY) (carrying a potential 10-15 year prison term under Article 314/1 of the Turkish Criminal Code ("TCC")); (ii) laundering revenues from crime; and (iii) attempting to overthrow the constitutional order (which is punishable with aggravated life imprisonment pursuant to Article 309/1 of TCC). (See Declaration of Mehmet Tahsin ["Tahsin Dec."] ¶6(d), dated February 26, 2020, which is resubmitted in opposition to the subject Petition).

Further, on April 10, 2017, an indictment was issued against Feza Gazetecilik AS ("Feza"), which published the newspaper Zaman Daily, which is a subject of the arbitration in question herein. The Feza indictment includes the following descriptive charges by the prosecutor (Id. ¶ 11(a)):

> It has been determined by the auditors that the natural and legal persons to whom the mentioned companies sold their assets are members of or affiliated with or in contact with FETO-PDY, that these large-scale changes that had occurred before trustees were appointed to the mentioned companies are suspicious and that it is strongly probable for these to be used in the financing of the organisation and serve to organisational purposes.

Mr. Cicek was included in the indictment under the investigation no. 2018/13868. (See D.E. 54-13). In that indictment Mr. Cicek was accused of "*Laundering the*

*Asset Values Deriving From the Crimes, Establishing and Managing the Armed Terror Organization, Attempting Annihilation of the Constitutional Order*". (Id.)

There also are numerous warrants issued against Mr. Cicek and his assets. (See Tahsin Dec., ¶5), which are as follows:

i.      A search warrant was issued against Mr. Çiçek on July 26, 2016 under the investigation no. 2014/39856. (Id.) Those included in that warrant (including Mr. Çiçek) were accused of committing "*being a member of a terrorist organization and attempting to overthrow the Government of the Republic of Turkey or prevent it partially or fully from carrying out its functions*". (See Declaration of Ronald A. Berutti, dated June 15, 2020 ["Berutti Dec.], Ex. D, p.1)

ii.     A seizure warrant was issued against Mr. Çiçek on December 1, 2016 under the investigation no. 2016/110288. (See Tahsin Dec., ¶5) Those included in that warrant (including Mr. Cicek) were accused of "*being a member of a terrorist organization, provided financial support for the terrorist organization or acquired assets with the advantage of being a member of the terrorist organization, and put the assets they acquired into the service of the terrorist organization; further, some of the suspects are trying to transfer their assets illegally.*". (See Berutti Dec., Ex. F, p.1)

5

iii.    A warrant appointing trustees of all of Mr. Cicek's personal assets was issued on March 27, 2017, under the investigation no. 2014/47593. (See Tahsin Dec., ¶5). Those included in that warrant (including Mr. Cicek) were accused of providing "*financial support to the Armed Terrorist Organisation FETO/PDY*". (See Tahsin Dec., Exhibit E, page 1)

Such criminal charges and investigations are directly related to the Republic's discovery requests. (See Tahsin Dec., ¶13 and Annex 1).  Given the secrecy of proceedings in Turkey, some of these investigations may have ripened into formal charges, and other charges also may have been brought which are currently unknown to the public. (Id. ¶¶6-8). Despite this Court's command to explain the impact of potential discovery on the pending criminal charges, the Republic provided no information regarding the status of any of the above matters in its Petition.

## B.    Mr. Cicek's Absolute Constitutional Right Against Testimonial and Documentary Self-Incrimination Under the Turkish Constitution.

Article 12/1 of the Turkish Constitution provides that the fundamental rights and freedoms provided for in the Constitution are inviolable and inalienable. (Berutti Dec. Ex. C).  Further, judges in Turkey "shall give judgment in accordance with the Constitution, laws, **and their personal conviction** conforming with the law." (Id., p. 57 of 84) (emphasis added). Thus, the Republic's judicial system is

not based on common law, but rather on statutory law as interpreted by judges whose own personal convictions may govern. As detailed below, the judiciary has been purged of judges who were suspected of not supporting the government in its purges of alleged Gulen Movement members.

Article 38/5 of the Turkish Constitution provides: "No one shall be compelled to make a statement that would incriminate himself/herself or his/her legal next of kin, or to present such incriminating evidence." (Id. p. 21 of 84). Mr. Tahsin has declared that Mr. Cicek's right against testimonial and documentary self-incrimination is absolute. Moreover, he asserts that the prospectively subpoenaed documents are directly applicable to the existing criminal charges against Mr. Cicek. (Tahsin Dec., ¶¶11(a), 13-15). Mr. Tahsin's Declaration was filed without any objection thereto ever being raised by the Republic. The Republic later was compelled to admit that it likely will use the evidence it obtains to aid in its prosecutions of Mr. Cicek, per Turkish law. (D.E. 39-4; D.E. 48, pp. 14-15).

**C.**   **The Treaty of Extradition and Mutual Assistance in Criminal Matters.**

On January 1, 1981, the *Treaty of Extradition and Mutual Assistance in Criminal Matters   between the United States and the Republic of Turkey*, (the "Treaty"), 32 U.S.T. 3111, took effect. (Berutti Dec., Ex. H). Section II concerns "Mutual Assistance in Criminal Matters", including the permissible method for making document requests related to criminal prosecutions. Judicial assistance

may be refused when "the Requested Party considers [the charge] to be a political offense, or an offense connected with a political offense."

Mr. Cicek asserts that other than through use of the Treaty, there is no other way for the Republic legally to seek aid in its prosecution of U.S. residents who are criminally charged under the Republic's laws, considering the Statute's limiting language concerning the pendency of formal criminal charges. Thus, the Treaty precludes the relief requested under the Statute given the now-admitted dual purposes of the information being sought with the Petition.

**D.**     **The Persecution of Members of the Gulen Movement by the Republic.**

The *Turkey 2018 Human Rights Report*, published by United States Department of State, Bureau of Democracy, Human Rights and Labor, outlined the Republic's governmental response to an alleged coup attempt that occurred in July, 2016.  By year's end, authorities had dismissed or suspended more than 130,000 civil servants from their jobs, arrested or imprisoned more than 80,000 citizens, and closed more than 1,500 non-governmental organizations (NGOs) on terrorism-related grounds." (Berutti Dec., Ex. I, p.1). The Republic accused such individuals of having "ties to cleric Fethullah Gulen and his movement, accused by the government of masterminding the alleged coup attempt, and designated by the Turkish government as the 'Fethullah Terrorist Organization (FETO).'" (Id.). Further (Id., pp.1-2 )(emphasis added):

8

**Human rights issues included reports of arbitrary killing; suspicious deaths of persons in custody; forced disappearances; torture; arbitrary arrest and detention of tens of thousands of persons, including opposition members of parliament, lawyers, journalists, foreign citizens, and Turkish-national employees of the U.S. Mission to Turkey for purported ties to "terrorist" groups or peaceful legitimate speech; political prisoners, including numerous elected officials and academics; closure of media outlets and criminal prosecution of individuals for criticizing government policies or officials; blocking websites and content; severe restriction of freedoms of assembly and association; restriction of freedom of movement; and violence against women, and lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons, and members of other minorities."**

The report further discusses a wide variety of torture techniques; cruel and unusual punishment used in Turkey, and degrading treatment, all of which is prohibited by Turkish law. **There continued to be ongoing to rising reports of individuals linked to the Gulen Movement being subject to torture and inhumane practices, including "brutal interrogation techniques aimed at extracting forced confessions and coercing detainees to incriminate others."** (emphasis added) (Id., pp. 4-5).

Additionally, the Republic's legislature adopted new "antiterror legislation", pursuant to which a person could be detained without being charged for forty-eight (48) hours for an "individual" offense, and up to seventy-two (72) hours for a "collective" offense. Such periods could be extended twice with the approval of a judge, meaning that authorities could hold a person without a charge for up to six days for individual offenses, and up to twelve days for collective offenses, which

has caused great concern for human rights organizations over the increase in torture of numerous persons, including foreign citizens. (Id., p.10). Indeed, **reports provide that many attorneys refused to take cases for any individuals charged with ties to the Gulen Movement for fear that they, themselves, would face prosecution**. In addition, defense attorneys who have braved potential persecution for representing those allegedly associated with the Gulen Movement, have had their conversations with their clients recorded by prosecutors, and have been denied access to their clients' files for weeks and months, hampering their ability to defend their clients. (Id., pp. 10-11).

The positions taken by the Republic in extradition hearings of Gulen Movement members have been shams. An explanation of how and why the Republic has engaged in the crackdown against alleged Gulen Movement members, and an example of how it pursues perceived enemies of the state across international borders, is found in the case of three defendants who were previously arrested and whom the Republic sought extradition from the United Kingdom. (See Berutti Dec., Ex. Q, *Ruling in the Matter of Talip Buyuk, Ali Celik, and Hamdi Akin Ipek*, November 28, 2018 [hereafter "*Buyuk*"]).

The original indictment against the three named defendants in *Buyuk* was over 2,000 pages long. **Similar to the matter sub judice, the *Buyuk* defendants argued that their prosecution was politically motivated; that it was impossible**

**for them to receive a fair trial in Turkey; that the prison conditions in Turkey were in violation of both Turkish and international law; that they would suffer prejudicial/discriminatory treatment in custody if returned to Turkey; and that the Republic's request was an abuse of process**. (Id., p. 8, p. 10, #s 38, 51).

The defendants called Sir Jeffrey Jowell, a highly distinguished Professor of Law at University College London, and author of the *Rule of Law in Turkey*, who was knighted "for his services to Human Rights, Democracy, and the Rule of Law", as an expert witness. ("Prof. Jowell") (Id. p. 11, #53). In summary, **Prof. Jowell testified that the charges against the defendants were politically motivated, that there was overwhelming evidence that none of the defendants would receive a fair trial in Turkey, and that there was real risk that the defendants would suffer violations in respect to the anticipated treatment/detention within the Turkish prison system**. (Id. p. 11, #55).

Prof. Jowell recounted the critical series of events occurring in Turkey in and **after December 2013**. He noted that on December 17, 2013, numerous suspects were arrested and detained, related to an investigation for bribery of public officials, and smuggling of large quantities of gold out of the country. Among those arrested were three sons of cabinet ministers, a high-profile mayor from the ruling political party, and the manager of Turkey's largest State-owned

bank. **The investigation revealed an incriminating telephone conversation between then-Prime Minister Recep Tayyip Erdogan (now President Erdogan), and his son**, with the former instructing the latter to hide a large sum of money from investigators. Prof. Jowell testified that (emphasis added):

> **with the onset of damaging corruption charges looming**, the Turkish government reacted by alleging that the investigation was part of an attempted judicial coup instigated by what has been termed a 'parallel structure' inside the State of Turkey, which was orchestrated by followers of Fethulah Gulen. **Mr. Erdogan called the FETO movement a terrorist organization, and vowed to locate and 'destroy' all of its members.**

(Id. p 12, #56-58). Prof. Jowell further testified that **the next day**, numerous police officers--many of them high-ranking--were summarily removed from their positions. On December 25, 2013, newly installed police officers summarily refused to carry out previously issued investigation-related search warrants and arrest warrants, including one upon Erdogan's son. One prosecutor who publicly denounced the government for obstructing the investigation was removed. "Important changes to certain aspects of criminal procedure were then hurriedly adopted," leading to an "extraordinary crackdown by the Turkish authorities." (Id. p.12, #62). Prof. Jowell then testified as to the "said corruption investigation" leading to the removal or relocation of tens of thousands of police officers, civil servants, judges, and prosecutors for "their purported support of and /or links to the Gulenist Movement." (Id. p. 12, #63).

The Court determined that Prof. Jowell's testimony was persuasive, and that there is "substantial evidence that … [the Republic's] request is politically motivated" and "that there are real risks ... for all three defendants … by reason for their perceived political opinions." (See Id., Ex. Q, p.13, #66).

The defendants then called a second witness, "Witness A", "a former member of the Turkish Judiciary who had fled the country fearing for his own safety." (Id., P. 13, #69). Witness A "provided the Court with a first-hand account of a number of measures imposed by the Turkish government," including a "purge of the Judiciary" involving (emphasis added)

> **the removal of a considerable number of fellow Judges who were known to him (directly or indirectly), and who he continues to hold in high regard as being independent, reliable, and honest. He added that they were replaced by judges whose independence was compromised and who were obligated to do the bidding of the government.**

(Id. p. 13-14 #69-70). Like Mr. Cicek, Witness A learned that some criminal charges were brought against him by the Republic, but was unaware of the full details. He strenuously denied being a part of the Gulen Movement, and **stated that most of the judges that he worked with have been imprisoned since being arrested in July 2016, "on the pretext of terror charges", and that "most remain in solitary confinement."** (Id. p.14, #73) (emphasis added).

In response to such testimony, the Republic submitted a hearsay document created by the Turkish Ministry of Justice for exactly such situations. (Id. p. 19,

13

#102). The document provided, in effect, that although there were a multitude of acquittals for those accused of offenses connected to their alleged membership in FETO, appeals resulted in many reversals, such that the courts could not rely on defense witnesses, statements, and evidence from the police. Thus, by using a self-serving, government-issued hearsay statement, the Republic sought to defeat the live and powerful testimony of Prof. Jowell, Witness A, and others.

In making the determination not to extradite the defendants back to Turkey, the Judge stated that "the evidence … satisfies me to the necessary standard that the decision to prosecute…was politically motivated (*i.e.* by reason of their actual or purported political views as alleged members and supporters of FETO) … each defendant will face a real risk of … ill treatment in the event of return, again by reason of their actual or perceived political opinions such that extradition must be refused." (Id. p. 21, 115). The Judge further raised "serious concerns about the prison conditions", "such as deliberate ill-treatment of prisoners by staff or fellow inmates." (Id. p. 22, #120). The Court additionally found that there is "real and imminent risk" to the lives of the defendants if extradited, and also that the Turkish authorities were "unable or unwilling to take appropriate preventative measures to reduce such risk" to the defendants. (Id. p. 21, #116).

The Republic twice appealed said Order twice (Id., Ex. R, S). While both appeals failed, the concerted effort by the Republic to use a hearsay document

excusing its own misconduct, and then twice appealing an adverse decision, demonstrates that the Republic will stop at nothing to persecute alleged Gulen Movement supporters in foreign countries.

The criminal procedure against Mr. Cicek dates to July 2016. The Republic declared a State of Emergency on July 21, 2016. (Id., Ex. J, p. 2). The United Nations notes that many of the twenty-two emergency Decrees promulgated thereafter bypassed the Republic's Legislature and Constitutional Court, and "fall short of basic human rights safeguards..." (Id.) The Decrees allow those working within their framework to behave with "impunity and lack of accountability by affording legal, administrative, criminal and financial immunity to administrative authorities." (Id.)  Consequently, the Decrees resulted in (emphasis added):

> **arbitrary mass dismissals of civil servants and private sector employees; arbitrary closure of civil society organizations, including prominent human rights non-governmental organizations (NGOs) and media; arbitrary detention of people arrested under the state of emergency measures; the use of torture and ill-treatment during pretrial detention; restrictions of the rights to freedoms of expression and of movement; arbitrary expropriation of private property; and methods of collective punishment targeting family members of individuals suspected of offences under the state of emergency.**

(Id.) Indeed, the United Nations further reports that one such Decree provided for dismissal of judges and prosecutors who were allegedly linked to the Gulen Movement. Thus, **"a large number of judges and prosecutors were dismissed, arrested and detained since the failed coup attempt; 4,240 Judges and**

**prosecutors were dismissed through executive orders of the High Counsel of Judges and Prosecutors, and the Constitutional Court dismissed two of its judges."** (Id., pp. 12-13) (emphasis added).

Further, by the time the U.N. Report was issued, at least 152,000 civil servants were dismissed; massive dismissals of teachers and academics linked to the Gulen Movement occurred; 159,506 arrests had been made under emergency Decrees; 1,719 "human rights, humanitarians, lawyers' associations, foundations, and NGO's" had been permanently closed, and "some 166 media outlets, including publishing houses, newspapers and magazines, news agencies, television stations and radios" were liquidated.   Over 300 journalists were arrested and detained, approximately 100,000 websites were blocked, 50,000 passports were cancelled and some "570 lawyers were arrested, 1,480 faced some kind of prosecution and 79 were sentenced to long-term imprisonment." (Id. at 2-3).

The United Kingdom, in its *Country Policy and Information Note* on *Turkey: Gulenist Movement* (Id, Ex. K, pp. 5-6), noted that the Gulen Movement is a term used to describe those who follow the United States-based Mr. Gulen; "the movement is not a political party, neither is it a religion. Gulen Movement supporters adhere to support for such things as interfaith dialogue, modern education, ethics in education, media, business, and public life," and opposition to using Islam as a political ideology. (Id., pp. 16-17). The Gulen Movement "is

16

believed to have a large number of sympathisers in Turkey; some estimate the number to be in the millions." Of great importance to Mr. Cicek's situation, which reasonably strikes tremendous fear in him, is the following:

> There have been reports of **Turkish nationals living outside Turkey**, who are suspected by the Turkish authorities of involvement in the Gulenist movement, **having their passports cancelled and replaced with a one-day passport to use to return to Turkey to be tried.** Teachers and the military appear to have been particularly affected. Others suspected of involvement in the Gulenist movement may be prevented from leaving Turkey. **In June 2017, it was thought that 140,000 people had had their passports cancelled.**

(Id., p. 8). "Persecution" is how the conditions faced by those fleeing the Republic for their alleged ties to the Gulenist Movement have been described. (Id.) The U.K. Home Office further notes (Id., p. 16):

> The US DoS' International Religious Freedom report covering 2016 noted, 'The media estimate there may be from 200,000 to four million people influenced by the movement led by Muslim cleric Fethullah Gulen, which identifies itself as an Islam-inspired civic, cultural, and educational movement. In 2013 the BBC stated that the Gulenist movement had no formal structure, visible organization or official membership, but there were said to be millions of followers in Turkey. In 2000, *The Guardian* stated that Gulen had 'hundreds of thousands' of supporters.

Of great significance to this matter is that **"Fethullah Gulen has been living in exile in the U.S. since 1999. The Turkish government has asked the U.S. government to extradite him to Turkey."** (Id., p.18) (emphasis added). Although blaming Mr. Gulen for planning the purported coup attempt, "Mr. Gulen denied the claims and has condemned the coup." (Id., p. 20). "Some of those

convicted of crimes against the state have no direct links to the coup attempt, but were jailed instead for protesting or expressing criticism of the increasingly authoritarian governing style of President Recep Tayyip Erdogan." (Id., p. 35). Further, the Republic's prison conditions have deteriorated to the point where "torture and mistreatment in prisons have also increased over the last year. **Prisoners have reported being held in stress positions over prolonged periods, which also being subjected to sleep deprivation, beatings, sexual abuse, and threats of rape."** (Id., p. 37) (emphasis added); (see also Id., p. 38, quoting an April 2017 *New York Times* article noting the serious torture of alleged Gulenists).

The European Commission assessed the Republic in reviewing its suitability for joining the European Union. (Id., Ex. L). The Commission asserted that while it is appropriate to take action to support democratic institutions in the wake of the alleged coup attempt, "the broad scale and collective nature, and the disproportionality of measures taken since the attempted coup under the state of emergency, such as widespread dismissals, arrests, and detentions, continue to raise serious concerns." (Id. at p. 3). The Commission continued (emphasis added):

> Overall, over 150,000 people have been taken into custody since the state of emergency began. This included a large number of critical voices. Over 78,000 people have been arrested based on terror-related charges, of which, at the end of January 2018, 54,000 had been released pending trial with judicial control and 24,660 remained in pre-trial detention. Judicial processes involving suspected members of the Gulen movement and coup plotters raised serious questions about the respect of international standards. **It is of particular concern that**

**relatives of suspects were directly or indirectly targeted by a series of measures, including dismissal from public administration and confiscation or cancellation of passports.** A set of unofficial criteria were relied upon to determine alleged links to the Gulen movement, including the attendance of a child at a school affiliated with the organization, the deposit of money in the bank affiliated with the organization or the possession of the mobile messaging application By Lock.

Freedom House, in its report *Freedom in the World 2019*, placed the Republic in the company of Russia, China, Iran, and Saudi Arabia as having "**recently targeted political dissidents abroad with practices such as harassment, extradition requests, kidnapping, and even assassination.**" (Id., Ex. M, p. 6**)** (emphasis added)**.** It further noted that the Republic "has *by its own account* captured 104 of its citizens from 21 countries in the last two years in a global crackdown on perceived enemies of the state." (Id.).

Meanwhile, the World Justice Project ("WJP"), in its *Rule of Law Index 2019* (Id., Ex. N), presents a portrait of the rule of law in 126 countries by providing scores and rankings based on eight factors: constraints on government powers, absence of corruption, open government, fundamental rights, order and security, regulatory enforcement, civil justice, and criminal justice. (Id. Introduction). Its country scores and rankings are derived from more than 120,000 household surveys and more than 3,800 expert surveys in 126 countries and jurisdictions. It is the world's most comprehensive database of its kind, and the

only one to rely principally on primary data, measuring countries' adherence to the rule of law from the perspective of ordinary people and their experiences. (Id.)

**WJP ranked the Republic as number 109 out of 126 countries in overall score for following the rule of law,** *behind even Iran*. Of the thirteen nations of the Eastern Europe & Central Asia Region, WJP ranked the Republic last. (Id., p.18). **And in the rankings for "Constraints on Government Powers", the Republic ranked number 123 out of 126, ahead of only Cambodia, Nicaragua, and Venezuela.** (Id., p. 22). **The Republic also ranked 122 of 126 in Fundamental Rights**. (Id., p. 25). In the WJS breakdown of questions from the Republic's individualized household survey, only 8.6 percent of those surveyed believed that there was "no improper government influence" in the government; less than half of those surveyed believed there was due process of law; and only one-third of those surveyed believed that there was no discrimination in the government. Further, most felt there to be discrimination of their "fundamental rights", such as freedom of expression, religion, right to privacy, and of association. (Id. p. 147).

Human Rights Watch reports that of the 48,924 Turks who were imprisoned on terrorism charges, "34,241 were held for alleged Gulenist (FETO) links …" (Id., Ex. O, p.2). Human Rights Watch further asserts (p. 6):

> Turkish authorities continued to seek the extradition of alleged Gulen supporters, many of them teachers, from countries around the world.

Without adhering to legal due process, security services in countries including Kosovo and Moldova cooperated with Turkish agents during the year to apprehend and transfer Turkish citizens to Turkey where they were detained and prosecuted.

The Republic has disclosed none of this in the Petition, beyond a passing reference in a news article it attached to the Mascarenhas Declaration. (D.E. 54-9). Instead, the Republic leads the reader to believe that Mr. Cicek is part of a small, radical, and dangerous group which must be brought to justice, thus flipping the truth on its head to create terror in the victim, not to aid in eliminating terror. The Republic has provided no evidence contradicting Mr. Cicek's evidence of the Republic's gross human rights abuses of those it considers to support Mr. Gulen.

## LEGAL ARGUMENT

## POINT I: THE REPUBLIC HAS FAILED TO SUBMIT ADMISSIBLE EVIDENCE WHICH SUPPORTS ITS PETITION, SUCH THAT THE PETITION MUST BE DENIED.

In this Court's Letter Order of June 4, 2020, the Republic was directed when filing its new Petition to address "the relevance of pending criminal charges against Cicek in the Republic of Turkey." (D.E. 53, p.2). In its second Petition, as with the *Buyuk* case which is detailed above, rather than provide any admissible evidence as to the criminal charges brought against Mr. Cicek, the Republic relies strictly on hearsay, this time in the form of the Mascarenhas Declaration (Doc. 54-4). Mascarenhas is not licensed in Turkey, and has no personal knowledge of the criminal proceedings against Mr. Cicek or how the discovery being sought may

21

impact such criminal proceedings. His substantive declaratory statements on such subjects all are hearsay statements "upon information and belief."

"Affidavits, declarations, certifications and other documents of the type referenced in 28 *U.S.C.* § 1746 shall be restricted to statements of fact within the personal knowledge of the signatory." *L.Civ.R.* 7.2(a). "A witness who has personal knowledge about the matter at issue is competent to testify" per *Fed. R. Evid.* 602. *Beunick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017). Expert Declarations are permissible where they rest on a sound foundation for expert testimony.  See *Neale v. Volvo Cars of N. Am., LLC*, No. 2:10-CV-04407 DMC, 2013 WL 5676640, at *2 (D.N.J. Oct. 16, 2013) (striking an expert's Declaration where it was admitted by the expert that it did not rest on a firm scientific basis).

Mr. Cicek notes that in § 1782 proceedings, Declarations of experts on applicable foreign law are admissible. See, e.g., *In re O'Keeffe*, No. CIV.A. 14-5835 WJM, 2015 WL 540238, at *4 (D.N.J. Feb. 10, 2015), aff'd sub nom. *In re The Application of Kate O'Keeffe for Assistance Before a Foreign Tribunal*, No. CIV. 14-5835 WJM, 2015 WL 5039723 (D.N.J. Aug. 26, 2015, aff'd sub nom. *In re O'Keeffe*, 646 F. App'x 263 (3d Cir. 2016) (noting that competing experts as to foreign law who stated opposing positions was unhelpful to the court). Here, the Republic has not submitted an expert Declaration contradicting that of Mr. Tahsin, making Mr. Tahsin the only authoritative evidence as to the impact of the

discovery on pending criminal charges and Mr. Cicek's Turkish constitutional rights against testimonial and documentary self-incrimination.

The Statute provides, in pertinent part, as follows (emphasis added):

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted *before formal accusation*…

**A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.**

The Republic admits that it has formally accused Mr. Cicek on at least one charge. (D.E. 54-13). However, there is at least one other formal indictment involving Mr. Cicek, as explained above, and there are other criminal 'investigations' based on formal accusations against Mr. Cicek of committing many other different crimes. Per Mr. Tahsin, such accusations may already be formal charges which, given the secrecy of Turkish criminal procedure, may not yet have been made public. Since the Republic has not addressed any of such charges, it is impossible to know all the formal criminal charges pending against Mr. Cicek.

The Republic also has been forced to admit (only after Mr. Cicek challenged the original *ex parte* Petition) that the information it seeks will be turned over to prosecuting authorities in the Republic and may be used in support of the criminal

charges against Mr. Cicek. Mascarenhas admits only be being "generally aware of the CMD/Feza criminal proceedings in Turkey," and "understand[s] that Cicek is not listed as a suspect in those proceedings, and he has not been charged with any crimes in that case." (D.E. 54-4, ¶16). Mascarenhas then asserts that he "understand[s]" that only one criminal proceeding "has been initiated against Cicek" which, he contends, "is not at issue in the International arbitration or the current Petition". (Id. ¶17). Finally, Mascarenhas baselessly asserts his opinion that "[t]o the extent there are any other criminal proceedings underway in Turkey, Cicek faces no threat or potential harm to him" (Id. ¶18).

The Mascarenhas Declaration amounts to nothing but a series of self-serving uneducated guesses. He was fully aware of the existing Tahsin Declaration (D.E. 34-4). Mr. Tahsin is a licensed Turkish attorney who is familiar with the charges and investigations being conducted (to the extent that they have been made public), as well as with the Republic's crackdown of supporters of Mr. Gulen, particularly in the newspaper industry, which is pertinent to the arbitration. Mr. Tahsin has made a Declaration in which he demonstrate, without limitation, that (1) Mr. Cicek has been formally charged with two crimes--one personally and one via an indictment of the newspaper publisher Feza; (2) that there are several other pending criminal investigations pending against Mr. Cicek which may already have been charged as crimes; (3) that the allegations in all such matters are directly

related to the information being sought in the documentary subpoena (which is virtually identical, substantively, to the documentary subpoena obtained by the Republic through the original *ex parte* Petition proceeding, beyond elimination of Request 11 from the original subpoena [D.E. 1-2; 54-2) and, thus, the deposition subpoena; and (4) that Mr. Cicek has an absolute right against self-incrimination under Article 38/5 of the Turkish Constitution with respect to both the documentary production and testimony.  Only Mr. Tahsin has provided competent evidence as an expert as to Turkish law, and the impact of the charges and investigations against Mr. Cicek.

Further, Mascarenhas' assertion that the criminal charges are not in issue in the International Arbitration should be stricken. Mascarenhas still asserts that the arbitration proceedings are confidential (D.E. 54-4, ¶2), as has been the Republic's position since the inception of this matter. (D.E. 1-4, ¶2). Efforts have been made by Mr. Cicek to compel the Republic's attorneys to reveal exactly how the criminal charges against Mr. Cicek have been used in the arbitration to test Mascarenhas' ongoing assertion that the criminal charges are not relevant to the arbitration. (See, e.g., D.E. 49-1, pp. 31-31 of 39, fn. 5). Hiding behind the alleged confidentiality, the Republic and its attorneys have not provided any arbitration documents which would reveal the full truth about how Mr. Cicek's alleged crimes come into play in the arbitration. Indeed, King & Spalding was subpoenaed for such information, and

25

refused to respond to the subpoena. (Berutti Dec., Exs. A and B). Thus, Mascarenhas' hearsay claim that the charges against Mr. Cicek are not pertinent to the arbitration must be stricken, since Mr. Cicek's efforts to test the truth of such assertion have been blocked by the Republic and its attorneys. Fundamental fairness and due process require nothing less.

The Republic has also never objected to the Tahsin Declaration and its Annex 1, where Mr. Tahsin provided a breakdown establishing that the documents requested in each request can be used as evidence for charges against Mr. Cicek. Annex 1 does not contain Mr. Tahsin's opinions, but rather provides fact conclusions based on the charging documents themselves.

Finally, Mascarenhas asserts that Mr. Cicek is not under threat of potential harm since "he is under indefinite asylum status in the United States" (Id. ¶18). The callous disregard of Mr. Cicek's likely permanent loss of liberty in his homeland, from which he fled persecution to the U.S., is appalling. Indeed, a criminal conviction may provide basis for the Republic to seek Mr. Cicek's extradition from the U.S. As noted in his Declaration, Mr. Cicek loves his homeland and one day hopes to return to. He does not wish to have to remain away from his homeland because of a life imprisonment sentence and a confiscation decision which will await him should he be convicted before his return; and he likewise fears for his family, friends, and property if he must provide documents

and testimony.  It is respectfully suggested that the prospective harm of discovery to Mr. Cicek--who will gain nothing from the arbitration-- is incalculable.

Since the Republic has not provided any admissible evidence as to how the evidence is relevant to the criminal charges against Mr. Cicek, the Mascarenhas Declaration should be stricken, and the Republic's Petition should be denied.

## POINT II: THE STATUTE PRECLUDES THE REQUESTED RELIEF GIVEN THE FORMAL CRIMINAL CHARGES AGAINST MR. CICEK.

The Statute very specifically provides that a "district court of the district in which a person resides or is found may order **him** to give **his** testimony … for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted **before formal accusation."** (Emphasis added). Such plain statutory language precludes discovery from the individual after that individual is formally charged. The statutory history relied on by the Republic says nothing different as to matters where formal charges have been made against the person from whom discovery is sought. (See D.E. 54-3, at 24-25 of 29, examining statutory history, none of which provides for an exception to the statutory language precluding relief in the case of a party who has been formally accused of a crime by the petitioner, but rather, which only discusses pending criminal investigations which have not risen to the point of a formal charge). No cases support a different conclusion, and rules of statutory construction support Mr. Cicek's assertion that the words and spirit of the Statute require the Petition to be denied.

27

First, the Republic cites to three cases in which it claims discovery was granted where a formal charge was pending.  However, none of those cases, *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 461 (2d Cir. 2014); *In re Ex Parte Application of Societe d'Etude de Realisation et d'Exploitation Pour le Traitement du Mais,* No. 13-mc-0266, 2013 WL 6164435, at *3 (E.D. Pa. Nov. 22, 2013*) In re Gianasso*, No. C 12-80029 MISC SI, 2012 WL 651647, at *1 (N.D. Cal. Feb. 28, 2012), involved facts where the charging party was seeking discovery under the Statute directly from "him", the formally accused, "to give his testimony." Rather, each concerns a third-party discovery request, thus rendering them all inapposite.

"It is well established that when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (quotation omitted). The Supreme Court has held as to ambiguous statutory language in *F.D.A. v. B & W Tobacco Corp.*, 529 U.S. 120, 133, (2000) (emphasis added):

> It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and **with a view to their place in the overall statutory scheme**." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989). **A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme**," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), and "fit, if possible, all parts into an **harmonious whole**," *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959).

28

Under the Republic's statutory construct the words "conducted before formal investigation" have no applicable meaning, because there is nothing that ever precludes discovery from an investigated person even where a formal investigation has been commenced. To the extent the Statute's language may be ambiguous, they cannot be construed "as a symmetrical and coherent regulatory scheme," which fit "into a harmonious whole," if a party simply can file a civil action parallel to a pending criminal action, and then seek statutory relief only pursuant to the civil action without regard to the pending criminal action. **Such interpretation renders the Statute's** *limiting* **"conducted before formal investigation" language** *limitless*. Any reading other than that a person charged with a crime cannot be statutorily compelled to give evidence to his accuser under any circumstance renders the protective language impotent, and offends operative principles of statutory construction. Thus, the Petition must be denied since such discovery is precluded pursuant to a plain reading of the Statute, and general principles of statutory construction.

## POINT III: MR. CICEK'S TURKISH RIGHT AGAINST SELF-INCRIMINATION IS ABSOLUTE.

Mr. Cicek has demonstrated that the Turkish privilege against self-incrimination is broader than the protection afforded to defendants under the Fifth Amendment of the United States Constitution, since it extends to documents and to

testimony which may incriminate him or even his close family members. Yet without any analysis of Mr. Cicek's inviolable and inalienable Turkish constitutional rights against testimonial and documentary self-incrimination, the Republic falls back on the Fifth Amendment, asserting **without citation** that "it is black letter law that the privilege would not operate in a blanket manner as to prevent this Court from issuing subpoenas in the first instance, or to excuse Cicek from producing documents, or appearing at a deposition." (D.E. 54-2 at 9 of 29). Such argument not only is baseless, but it is flawed.

The Supreme Court has specifically noted that in applications under the Statute, our Courts are to "shield[] material safeguarded by an applicable privilege…" *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 260 (2004). Such holding is based on the Statute's providing that "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."

Mr. Cicek's unchallenged evidence has demonstrated that Article 38/5 provides: "No one shall be compelled to make a statement that would incriminate himself/herself or his/her legal next of kin, or to present such incriminating evidence." (Berutti Dec., Ex. C). Further, Mr. Tahsin, asserts that the formal charges brought against Mr. Cicek are directly related to the international arbitration which is the alleged subject of the Republic of Turkey's discovery

requests in its second Petition, thus providing Mr. Cicek with an absolute constitutional right against testimonial and documentary self-incrimination related to such charges, pursuant to Article 38/5  of the Turkish Constitution. (Tahsin Dec. ¶11(a)). Mr. Tahsin has also detailed how the documentary discovery requests are directly pertinent to the formal charges against Mr. Cicek. (Id. ¶13). Finally, according to Mr. Tahsin, "the subpoenas seek to establish facts which would satisfactorily prove the alleged crimes which have been formally (and perhaps secretly) charged. (Id. ¶14). Mr. Tahsin thus concludes that Mr. Cicek has an **absolute constitutional right not to provide the testimony or documents which are being sought by the Republic**.

The Republic has not provided any admissible evidence to refute Mr. Tahsin's legal opinion that Mr. Cicek has an absolute privilege against self-incrimination, even though it was aware of his opinions from a prior submission. (D.E. 34-4). Indeed, the one time that the Republic provided any admissible evidence related to the applicability of Turkish law via a Declaration, the individual providing the Declaration confirmed the accuracy of Mr. Tahsin's statement that the Republic had to turn over the information obtained from any subpoena to Mr. Cicek to prosecuting authorities for aid in convicting him of the crimes for which he is charged. (D.E. 39-4). Thus, the Republic has not only

confirmed at least one of Mr. Tahsin's opinions, but also confirmed Mr. Tahsin's credibility. Consequently, the Petition should be denied.

Finally, Mr. Cicek notes that the proposed deposition subpoena is open ended and places no limits on the areas of testimony for which inquiry could be made. (D.E. 54-1). Given Mr. Cicek's right against self-incrimination, even if there was basis to grant the Republic's relief, which is denied, the proposed deposition is so overbroad as not to provide any guarantee that the scope of questioning would be limited to factors relevant to the arbitration, and well could cross over into critical areas of privilege, thus providing another ground for denying the Petition.

## POINT IV: EVEN IF A STANDARD STATUTORY ANALYSIS MUST BE EMPLOYED, THE PETITION MUST BE DENIED.

Mr. Cicek contends that considering the statutory bars to the Petition noted above, it is unnecessary for this Court to examine the factors pertinent to typical petitions filed under the Statute. However, should such factors be reached, they militate against granting the Petition given the admitted dual purposes of the discovery requests, and the Republic's well documented reign of terror against individuals such as Mr. Cicek, who are alleged to be supporters of Mr. Gulen, particularly given Mr. Cicek's asylum status.

The Statute "leaves the issuance of an appropriate order to the discretion of the court which, in proper cases, may refuse to issue an order or may impose conditions it deems desirable." *Intel*, supra, 542 U.S. at 260–61. Such discretion is

broad, and as will be noted below, both the Republic's persecution of alleged Gulen supporters, and Mr. Cicek's asylum status bear consideration when using such discretion in applying the *Intel* factors.

Before reaching the *Intel* analysis, the initial statutory factors noted in *In re Bayer AG*, 146 F.3d at 191, 193 (3rd Cir. 1998), must be considered.  Such factors require that the Petition is made (1) by an "interested person," (2) that the information sought is "for use in a proceeding in a foreign or international tribunal," and (3) that the petition seeks discovery from a person or entity that "resides or is found" in the district in which the petition is filed (quoting 28 U.S.C. § 1782(a)). As noted above, since the information sought will likely be used to aid in Mr. Cicek's prosecution for pending criminal charges in Turkey, and in violation of his Turkish constitutional rights against self-incrimination, Mr. Cicek contends that the Petition must be scrutinized not only with respect to the civil action under which it is sought, but also under the criminal action, since the Republic admits that the two are inseparable as a matter of Turkish law when determining how the evidence will be used. No other analysis will do justice to Mr. Cicek, whose liberty and property is in jeopardy, who has been granted asylum in the U.S., and who is not a party to the arbitration, yet is the target of the criminal complaints. The *Bayer*) standards thus cannot be satisfied considering the facts

related to the use of such discovery in the criminal proceedings, making it unnecessary to reach the *Intel* discretionary factors.

Even if the discretionary *Intel* factors are examined, the application of such factors weigh against granting the Petition. The Supreme Court developed such factors from reviewing Congressional Record related to the Statue's history, are (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the…request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) that "unduly intrusive or burdensome requests may be rejected or trimmed." Id. at 264-65.

Regarding the first factor, Mr. Cicek asserts that in some respects, he is a participant in the foreign proceeding. While the Republic seeks discovery under the guise of a civil arbitration claim, it has admitted that the discovery also will be provided to prosecutors for determination as to its impact on existing criminal charges against Mr. Cicek in Turkey--proceedings in which Mr. Cicek is a participant. (D.E. 39-4; D.E. 54-4). Thus, considering the dual purpose of the admitted discovery requests, such factor weighs against the Republic.

Regarding the second factor, Mr. Cicek asserts that the civil arbitration aspect of the discovery cannot be viewed in a vacuum, given that the discovery will be used in the criminal proceedings against him. Thus, the nature of the foreign tribunal is an international arbitration panel on the one hand, and the Republic's criminal courts on the other. In light of this dual purpose discovery request, the nature of the Republic, and the impact of its conduct generally, and against Mr. Cicek specifically, must be considered. The Ninth Circuit Court of Appeals noted in *United States v. Sealed 1, Letter of Request for Legal Assistance from the Deputy Prosecutor Gen. of the Russian Fed'n*, 235 F.3d 1200, 1206 (9th Cir. 2000) (emphasis added):

> The language of § 1782 itself does not provide specific guidance to district courts in exercising such discretion. The accompanying legislative history, however, does articulate several factors that district courts may consider in deciding whether to grant assistance under the statute: **"[T]he court may take into account the nature and attitudes of the government of the country from which the request emanates and the character of the proceedings in that country."** S.Rep. No. 88–1580, 88th Cong., 2d Sess. (1963), reprinted in 1964 U.S.C.C.A.N. 3782, 3788.

While *Sealed 1*) was decided before *Intel*, it too looked to the Congressional Record to reach its conclusion that the attitudes of the government and the character of the proceedings may be weighed. Such analysis fits well within the second *Intel* factor.

The Republic's attitudes toward individuals such as Mr. Cicek is abysmal. As is detailed above, there has been international condemnation by the U.S. Department of Justice, the European Union, the U.K. Home Office, the United Nations, and numerous international Human Rights Organizations of the Republic's treatment of alleged followers of Mr. Gulen. The purge of alleged Gulen supporter from influential posts has resulted in the free press in the Republic being eliminated, the independent judiciary being eliminated, the state police force being populated only by regime supporters, lawyers being eliminated and imprisoned, and teachers being eliminated. Alleged pro-Gulen newspapers, television stations, websites, and radio outlets have been closed and/or taken over, including that which had been owned by Mr. Cicek. Further mass imprisonment and torture characterize the threats to the existence of those allegedly supporting Mr. Gulen, all of which places the Republic beneath even Iran for its respect for human rights. Faced with such deprivations and horrors, Mr. Gulen escaped to the United States and was granted asylum as a persecuted person. To qualify for asylum based on past persecution, Mr. Cicek had to demonstrate that he suffered persecution.

> Persecution "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Fatin*, 12 F.3d at 1240. **Rather, we have defined persecution as including "threats to life, confinement, torture, and economic restrictions so severe that they constitute a real threat to life or freedom."** *Lin v. INS*, 238 F.3d 239, 244 (3d Cir.2001) (citation omitted).

36

*Lukwago v. Ashcroft*, 329 F.3d 157, 167–68 (3d Cir. 2003) (emphasis added). Thus, as a matter of law, Mr. Cicek has already been subjected to some of the greatest horrors with which a human may be faced, and the U.S. government has determined that he therefore is worthy of the nation's protection from the Republic. Yet here the Republic shows no regard for Mr. Cicek, and asks that this Court to perform an antiseptic analysis of its rights to seek civil discovery arising from the arbitration. Period. This Court should not be used by the Republic to do its bidding in its campaign of terror against Mr. Cicek and others similarly situation both within and without the Republic. A complete analysis based on all consideration should be conducted when considering the Petition, lest an incomplete review and unjust result occur.

Mr. Cicek legitimately fears continued persecution even within the United States, as agents of the Republic hunt down and harass alleged supporters of Mr. Gulen. (See Cicek Affirmation, ¶5 Exs. B and C). Similarly, Mr. Cicek fears how discovery that may be received from him will be used against his family, associates, and himself in terms of depriving them of life, liberty, and property. (Id., ¶¶6-11). Such now is the character of the Republic, and it militates against granting relief under the second *Intel* factor.

The third *Intel* factor also militates against granting the Petition. Specifically, the Republic has acted to avoid revealing to this Court that it

maintains ongoing formal criminal proceedings against Mr. Cicek for which it was going to use the subject discovery. While such information is at least partially in the open, there is no admissible evidence which provides the Court with a full accounting of the charges and investigations currently being pursued against Mr. Cicek. Likewise, the Republic continues attempting to cause Mr. Cicek to provide discovery which will aid in its prosecution of him, without addressing his Turkish constitutional right against self-incrimination. Rather than address it, the Republic relies only on the inadmissible Mascarenhas Declaration for an uneducated, non-factual, and self-serving assessment of how the evidence obtained may be used criminally against Mr. Cicek. Further, as set forth below, the request under the Statute violates the Treaty related to evidence gathering for an ongoing criminal case. All such efforts to avoid proof gathering restrictions militate against granting the Petition.

Finally, the fourth *Intel* factor weighs against granting the Petition, since (1) the document demands seek documents in violation of Mr. Cicek's right against self-incrimination which relate directly to the pending criminal charges against him; and (2) the deposition subpoena has no limits placed upon it as to what subjects may be covered.  At this late stage, and considering all the litigation that has followed the initial *ex parte* Petition, the Republic should have at least tried to tailor its discovery demands to Mr. Cicek's concerns about the prosecutorial

purposes of the discovery.  It has done no such thing.  Thus, since all four factors weigh against the Petition, it should be denied even under the *Intel* analysis.

## POINT V: THE REPUBLIC SEEKS TO VIOLATE ITS TREATY OBLIGATIONS WITH THE  PETITION.

The Treaty between the United States and the Republic provides the way that the Republic may seek discovery in aid of a criminal matter from a U.S. resident, including the way documents related to criminal prosecutions may be requested. Judicial assistance may be refused for certain reasons, including that the alleged offense is one "which the Requested Party considers to be a political offense, or an offense connected with a political offense." There is no other way for the Republic legally to seek aid in its prosecution of those criminally charged under its laws who are in the U.S., considering the Statute's language prohibiting discovery after initiation of a formal proceeding.

Mascarenhas asserts "upon information and belief, at present there is no pending extradition process initiated by the Republic against Mr. Cicek." (D.E. 54-4, ¶18). Again, Mascarenhas as incompetent to so Declare, as his statement is hearsay at best. No person with personal knowledge of extradition proceedings or plans for same has presented any admissible information on the Republic's behalf. Had the Republic proceeded under the Treaty, it would be obligated to fully explain all the existing circumstances with admissible proofs.

Further, the U.S. State Department's condemnation of the Republic's actions against alleged followers of Mr. Gulen, and Mr. Cicek's asylum, make it unlikely that a request by the Republic under the Treaty would be granted. Thus, the Petition should be denied.

## **CONCLUSION**

The Republic seeks to enlist the aid of this Court in obtaining the discovery that it wants from Mr. Cicek, which could result in his conviction of a crimes carrying a life sentence, in prisons where torture of those alleged to support Mr. Gulen reportedly is normal. This Court should not aid the Republic in its efforts to use civil process to gain the evidence which would hand a victory to Mr. Cicek's persecutor in its criminal courts.  Rather, it should require that any discovery sought by the Republic be obtained through the Treaty process, since the discovery is barred and otherwise should not be granted under the Statute. Thus, the Petition should be denied.

Respectfully submitted,
**WEINER LAW GROUP LLP**
By:   *Ronald A. Berutti*

Ronald A. Berutti
A Member of the Firm
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054-0438
Phone (973) 403-1100
rberutti@weiner.law

Dated:  June 15, 2020

1831362_1.doc